**FILED**

March 03, 2022

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____  J.B.

DEPUTY

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# MIDLAND/ODESSA DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | NO.  22-CR-**049** |
| Plaintiff, | **INDICTMENT** |
| v. | [Vio: 42 U.S.C. § 7413(c)(1)-Clean Air Act; 42 U.S.C. § 7413(c)(5)(A)-Clean Air Act; 29 U.S.C. § 666(e)-OSH Act; 18 U.S.C. § 1505-Obstruction; 42 U.S.C. § 300h-2(b)-Safe Drinking Water Act; 18 U.S.C. § 1001-False Statements; 18 U.S.C. § 2-Aiding and Abetting)] |
| AGHORN OPERATING, INC., TRENT DAY, and KODIAK ROUSTABOUT, INC., | |
| Defendants. | |

THE GRAND JURY CHARGES:

All times relevant to this Indictment:

## INTRODUCTION

1.     Defendant Aghorn Operating, Inc. ("Aghorn"), was incorporated in Texas, and had a principal office in Odessa, Texas. Aghorn was in the oil and gas industry, and owned and operated oil wells and leases in Texas.

2.     Defendant Trent Day was a chemical engineer and the Vice President of Aghorn. Day supervised all Aghorn field operations and employees. Day, whose supervisory duties included hiring and disciplining employees, making major expenditures, and reviewing and approving invoices, maintenance, worker safety, and regulatory compliance, was an operator of Aghorn oil wells and leases.

3.     Defendant Kodiak Roustabout, Inc. ("Kodiak"), was incorporated in Texas, and had a principal office in Odessa, Texas. Kodiak performed oilfield support and maintenance services for Aghorn. Defendant Trent Day was the Vice President of Kodiak, and supervised Kodiak operations.

## LEGAL BACKGROUND

### The Clean Air Act

4.      The Clean Air Act, 42 U.S.C. § 7401 et seq., is the Nation's comprehensive air pollution control statute, and includes provisions designed "to protect and enhance the quality of the Nation's air resources." 42 U.S.C. § 7401(b)(1).

5.      Section 112(r) of the Clean Air Act contains provisions to prevent the accidental release of regulated and extremely hazardous substances. 42 U.S.C. § 7412(r)(1).  This section imposes a general duty on owners and operators of stationary sources producing, processing, handling, or storing extremely hazardous substances. The general duty requires such owners and operators (1) to identify hazards that may result from such releases using appropriate hazard assessment techniques, (2) to design and maintain a safe facility taking such steps as are necessary to prevent releases, and (3) to minimize the consequences of accidental releases that do occur. 42 U.S.C. § 7412(r)(l).

6.      Hydrogen sulfide is an extremely hazardous substance. 42 U.S.C. § 7412(r)(3); 40 C.F.R. § 68.130 at Tables 1 and 2; 42 U.S.C. § 11002(a)(2); 40 C.F.R. Part 355 at Appendix A.

7.      Under the Clean Air Act any person who knowingly violates the general duty imposed by 42 U.S.C. § 7412(r)(1) has committed a crime. 42 U.S.C. § 7413(c)(1). Any person who knowingly releases into the ambient air any extremely hazardous substance, and who knows at the time that he thereby places another person in imminent danger of death or serious bodily injury, has committed a crime. 42 U.S.C. § 7413(c)(5)(A).

### The Occupational Safety and Health Act

8.      The United States Department of Labor ("DOL"), a department and agency of the executive branch of the United States Government, is responsible for the enforcement of the laws

2

of the United States in the area of labor and employment conditions, including the Occupational

Safety and Health Act of 1970 ("OSH Act"), 29 U.S.C. § 651 et seq. The OSH Act was designed

to assure safe and healthful working conditions.

9.      The Occupational Safety and Health Administration ("OSHA"), an agency of the

DOL, is responsible for administering the OSH Act through the promulgation and enforcement

of safety and health regulations covering federal and private sector workers throughout the United

States.

10.      Defendant Aghorn, as an entity engaged in the oil and gas industry, was subject to

the OSH Act and was obligated to comply with all relevant safety and health regulations

promulgated by OSHA. Defendant Aghorn was an "employer" under the OSH Act.

11.      An employer is required to protect employees from the harmful effects of

hydrogen sulfide and OSHA has set an acceptable ceiling concentration of 20 ppm and a

"maximum peak above the acceptable ceiling concentration" of 50 ppm. 29 C.F.R. §

1910.1000(b) and (e) (Table Z-2). An employer must determine and implement feasible

administrative or engineering controls to ensure employees are not exposed to hydrogen sulfide

above certain limits. 29 C.F.R. § 1910.1000(e). An employer is also required to establish and

implement a written respiratory protection program that includes the provisions of 29 C.F.R. §

1910.134(c)(1)(i)-(ix).

12.      OSHA is empowered to conduct investigations into violations of worker safety

standards, and issue citations and penalties for those violations. 29 U.S.C. §§ 657-59.

**The Safe Drinking Water Act**

13.      In 1974, Congress passed the Safe Drinking Water Act ("SDWA") to ensure that

the water delivered by public water systems is safe. 42 U.S.C. §§ 300f to 300j-27. The SDWA

regulates certain underground injections of materials beneath the land's surface. 42 U.S.C. § 300h(d).

14.     "Injection wells"—the wells regulated by the SDWA—are those wells "into which 'fluids' are being injected." 40 C.F.R. § 144.3. The United States Environmental Protection Agency ("EPA") has defined five classes of injection wells, with Class II wells receiving certain injected fluids related to oil and natural gas production. 40 C.F.R. § 144.6(b).

15.     Under the SDWA, states are the primary enforcers of the Underground Injection Control ("UIC") program. Once a state program meets minimum federal standards, it may secure primary enforcement authority for the regulation of underground water sources if the EPA approves the state's UIC program. 42 U.S.C. § 300h-4(c)(2). Texas has an EPA-approved UIC plan, administered by the Texas Railroad Commission ("RRC"). 40 C.F.R. § 147.2201.

16.     When a state obtains primary enforcement authority, the federal government retains enforcement authority, including the right to initiate criminal charges for violations of the SDWA. It is a crime under the SDWA for a person to willfully violate any requirement of an applicable UIC program. 42 U.S.C. § 300h-2.

17.     Any person in the State of Texas who engages in fluid injection operations in reservoirs productive of oil must obtain a permit from the RRC. 16 T.A.C. § 3.46(a). The mechanical integrity of an injection well must be evaluated by conducting pressure tests or alternative testing methods approved by the RRC. 16 T.A.C. § 3.46(j)(1).

18.     In evaluating the results of a pressure test, the RRC considers "the level of pollution risk that loss of well integrity would cause." 16 T.A.C. § 3.46(j)(4)(G). A pressure test may be rejected by the RRC "after consideration of the following factors: (i) the degree of pressure change during the test, if any; (ii) the level of risk to usable-quality water if mechanical

integrity of the well is lost; and (iii) whether circumstances surrounding the administration of the test make the test inconclusive." Id.

## FACTUAL BACKGROUND

### The Foster "D" Station

19.     "Produced water" is an oil well wastewater that contains a mixture of water, salts, and residual hydrocarbons. It can contain hydrogen sulfide, also known as "H2S." According to the National Institute for Occupational Safety and Health, hydrogen sulfide is an acute toxic substance that is the leading cause of sudden death in the workplace, and is especially toxic when it occurs in low-lying areas, confined spaces, or in high concentrations under pressure.

20.     "Water flooding" is a petroleum extraction technique that uses produced water to recover additional oil from mature oil fields. Produced water is injected into a formation in order to drive crude oil out of the ground.

21.     Aghorn operated a water flood station named the Foster "D," Section 8 Waterflood Station, located at 2216 W. 49th Street in Odessa, Texas (the "Station"). The Station received produced water from various adjacent oil producing leases, and injected it as part of an oil recovery project that has been in operation since 1974.

22.     The produced water traveled from the oil leases to a header, was pumped into a 3,000 barrel suction tank, and then moved through a suction line into injection pumps, where it was pressurized and sent out of the Station via an injection header, to be delivered to various injection wells tied to the system. Oil entrained in the produced water was separated from the produced water and ultimately recovered. Gas entrained in the produced water was to be drawn out of the suction tank with a vapor recovery unit and sent down the sales line or to the flare located at the north end of the facility.

5

23.     Aghorn was aware that its produced water contained high amounts of H2S as well as the deadly nature of the gas. In 2003, the company prepared a contingency plan "to alert and protect the public" in the event of an H2S leak, and described approximately 1200 wells "with various concentrations of hydrogen sulfide" located in residential and publicly accessible areas such as public roadways. The company attached a Data Sheet to the plan describing H2S as "[e]xtremely hazardous" and capable of causing "immediate death" at very high concentrations. On January 10, 2012, Aghorn wrote to the RRC that the hydrogen sulfide concentration of its produced water was 96,000 ppm.

24.     Defendant Trent Day was familiar with the Foster "D" Station, having supervised the operation and served as a relief pumper at the facility.

### The Deaths of Jacob and Natalee Dean

25.     On October 26, 2019, at approximately 6:51 p.m., Jacob Dean, an employee of Aghorn, responded to a call to check the pump house, an enclosed building with two bay doors at the Station. His wife, Natalee Dean, knew where Jacob had gone, and started calling him when he did not return in a timely manner. When those calls went unanswered, Natalee drove to the Station with her two children, aged nine and six, arriving at approximately 9:30 p.m.

26.     A pump had failed in the pump house, causing a leak of produced water containing H2S. Jacob had been overcome by H2S in the pump house, and when Natalee arrived at the Station, she exited the vehicle and proceeded to the pump house, where she too was overcome by the gas. Both Jacob and Natalee were found dead by the first responders to the scene.

27.     The Odessa Fire Department and the Ector County Sheriff's Office responded to the scene on October 26, 2019. Both bay doors of the pump house were open and dangerously elevated levels of H2S were detected. When the bodies of Jacob and Natalee Dean were

6

transported to a staging area approximately 300 yards south of the pump house, the H2S readings on Fire Department gas monitors increased.

28.     The Station had eight stationary H2S monitors that were designed, in the event of an H2S release, to display on a control panel and activate a light at the top of the pump house. On the night of October 26, 2019, none of the monitors were operable and readable at the control panel, and thus they did not trigger the light on top of the pump house to warn Jacob or Natalee Dean of the toxic level of H2S in the pump house.

29.     On the night of October 26, 2019, an Aghorn representative advised the Sheriff's Office that "the field had been shut in and there was no longer any product flowing." However, when Fire Department and law enforcement officials returned to the site the next day on October 27, 2019, they observed produced water leaking from the pump in the pump house and again detected elevated H2S readings outside the pump house bay doors, with a reading outside one of the bay doors of 150 ppm. The Fire Department then shut off the main suction line leading into the building, which succeeded in stopping the leak. When they returned to the site the following day, October 28, 2019, they detected a zero reading for H2S.

### The OSHA Investigation

30.     OSHA began an investigation on October 28, 2019, two days after the Dean fatalities. On that day, an OSHA inspector conducted an inspection of the Station. The OSHA investigation included document review and employee interviews, including interviews of Trent Day on October 28, 2019, and April 6, 2020.

### The Well Pressure Tests

31.     Aghorn operated numerous produced water injection wells, and submitted purported well pressure test results to the RRC. Typically, the submittals consisted of a completed

RRC "Form H-5" from Aghorn, with a pressure recording chart attached. The Form H-5 was signed by an Aghorn "Regulatory Analyst" along with a "Certificate" stating:

> I declare under penalties prescribed in Sec. 91.143, Texas Natural Resources Code, that I am authorized to make this report, that this report was prepared by me or under my supervision and direction, and that data and facts stated herein are true, correct and complete, to the best of my knowledge.

32.     The pressure recording charts attached to the Form H-5s were marked "Kodiak Roustabout, Inc.," identified the company for which the test was completed as "Aghorn Operating," and were signed by Trent Day, who was identified as "CO. MAN." Kodiak, which performed oilfield support and maintenance services for Aghorn, was tasked to conduct the pressure tests by Trent Day.

### Common Plan or Scheme

33.     The Grand Jury charges in this Indictment various types of conduct to include charges relating to the control of H2S and failure to conduct well pressure tests. The charges in this Indictment constitute a common plan or scheme by the Defendants to enrich themselves by maximizing the production of oil at Aghorn while minimizing costs, without concern for environmental pollution and worker safety risks, and to ensure that this activity was not discovered by regulators.

### COUNT ONE

### Clean Air Act – General Duty Clause

34.     Paragraphs 1-2, 4-7, 19-29, and 33 above are hereby realleged and incorporated by reference as if fully set forth herein.

35.     On various dates, including between in or about April 2017 to on or about October 26, 2019, in the Western District of Texas and elsewhere, the Defendants,

AGHORN OPERATING, INC., and TRENT DAY,

as owners and operators of a stationary source producing, processing, handling, and storing an extremely hazardous substance, to wit: hydrogen sulfide, knowingly violated their general duty to prevent the accidental release of the extremely hazardous substance into the ambient air from the stationary source, by failing to design and maintain a safe facility, to take such steps as are necessary to prevent releases, and to minimize the consequences of accidental releases which do occur.

A violation of Title 42, United States Code, Sections 7412(r)(l) and 7413(c)(1), and Title 18, United States Code, Section 2.

## COUNT TWO

### Clean Air Act – Knowing Endangerment

36.     Paragraphs 1-2, 4-7, 19-29, and 33 above are hereby realleged and incorporated by reference as if fully set forth herein.

37.     On various dates, including between in or about April 2017 to on or about October 26, 2019, in the Western District of Texas and elsewhere, the Defendants,

AGHORN OPERATING, INC., and TRENT DAY,

knowingly released into the ambient air an extremely hazardous substance, to wit: hydrogen sulfide, and knew at the time that they thereby placed another person in imminent danger of death or serious bodily injury.

A violation of Title 42, United States Code, Section 7413(c)(5), and Title 18, United States Code, Section 2.

## COUNT THREE

### OSH Act – Willful Violation Causing Death to Employee

38.    Paragraphs 1, 8-12, 19-29, and 33 above are hereby realleged and incorporated by reference as if fully set forth herein.

39.    On or about October 26, 2019, in the Western District of Texas and elsewhere, the Defendant,

AGHORN OPERATING, INC.,

did willfully violate 29 C.F.R. § 1910.1000(b)(2), a regulation prescribed pursuant to the OSH Act, and that violation caused death to an employee, to wit: the Defendant exposed an employee to hydrogen sulfide in excess of the peak concentration of 50 ppm, and thereby caused the death of employee Jacob Dean.

A violation of Title 29, United States Code, Section 666(e), and Title 18, United States Code, Section 2.

## COUNT FOUR

### OSH Act – Willful Violation Causing Death to Employee

40.    Paragraphs 1, 8-12 19-29, and 33 above are hereby realleged and incorporated by reference as if fully set forth herein.

41.    On or about October 26, 2019, in the Western District of Texas and elsewhere, the Defendant,

AGHORN OPERATING, INC.,

did willfully violate 29 C.F.R. § 1910.1000(e), a regulation prescribed pursuant to the OSH Act, and that violation caused death to an employee, to wit: the Defendant did not determine and implement feasible administrative and engineering controls to achieve compliance with the

exposure limits for hydrogen sulfide prescribed in 29 C.F.R. § 1910.1000(b), and thereby caused the death of employee Jacob Dean.

A violation of Title 29, United States Code, Section 666(e), and Title 18, United States Code, Section 2.

## COUNT FIVE

### OSH Act – Willful Violation Causing Death to Employee

42.     Paragraphs 1, 8-12, 19-29, and 33 above are hereby realleged and incorporated by reference as if fully set forth herein.

43.     On or about October 26, 2019, in the Western District of Texas and elsewhere, the Defendant,

AGHORN OPERATING, INC.,

did willfully violate 29 C.F.R. § 1910.134(c)(1), a regulation prescribed pursuant to the OSH Act, and that violation caused death to an employee, to wit: the Defendant did not establish and implement a written respiratory protection program that included the provisions of 29 C.F.R. § 1910.134(c)(1)(i)-(ix), and thereby caused the death of employee Jacob Dean.

A violation of Title 29, United States Code, Section 666(e), and Title 18, United States Code, Section 2.

## COUNT SIX

### Obstruction of OSHA Proceeding

44.     Paragraphs 1-2, 8-12, 19-30, and 33 above are hereby realleged and incorporated by reference as if fully set forth herein.

11

45.     On or about October 28, 2019, in the Western District of Texas and elsewhere, the Defendants,

AGHORN OPERATING, INC., and TRENT DAY,

did corruptly obstruct, impede, and endeavor to obstruct and impede, the due and proper administration of the law under which a pending proceeding was being had before the Occupational Safety and Health Administration, an agency of the United States; that is, Trent Day, acting individually and within the scope of his agency and employment for Aghorn Operating, Inc., and at least in part for the benefit thereof, falsely stated in substance in an interview with OSHA that, regarding stationary H2S monitors at the Station: (1) they were calibrated, including that "calibration [was] done every 90 days," and the "sensors" were "calibrated;" (2) "if one of the sensors senses the reading of 10 ppm, you get a call for H2S. Whoever is program[ed] into the call out system;" and (3) "an alarm at 10 ppm [of H2S] triggers an alarm."

A violation of Title 18, United States Code, Sections 1505 and 2.

## COUNT SEVEN

### Obstruction of OSHA Proceeding

46.     Paragraphs 1-2, 8-12, 19-30, and 33 above are hereby realleged and incorporated by reference as if fully set forth herein.

47.     On or about April 6, 2020, in the Western District of Texas and elsewhere, the Defendants,

AGHORN OPERATING, INC., and TRENT DAY,

did corruptly obstruct, impede, and endeavor to obstruct and impede, the due and proper administration of the law under which a pending proceeding was being had before the

12

Occupational Safety and Health Administration, an agency of the United States; that is, Trent

Day, individually and acting within the scope of his agency and employment for Aghorn

Operating, Inc., and at least in part for the benefit thereof, falsely stated in substance in an

interview with OSHA, regarding self-contained breathing apparatuses, that prior to October 26,

2019 a "fitting test" was conducted where "everybody brought their gear in," stating in substance:

> We have fit testing training, prior to the accident we had H2S, fitting test,
> everybody brought their gear in, it was tested. H2S awareness training and
> equipment maintenance.

A violation of Title 18, United States Code, Sections 1505 and 2.

### COUNT EIGHT

### The Safe Drinking Water Act

48.     Paragraphs 1-3, 13-18, and 31-33 above are hereby realleged and incorporated by reference as if fully set forth herein.

49.     On various dates from in or about July 2017 to in or about September 2019, in the Western District of Texas and elsewhere, the Defendants,

AGHORN OPERATING, INC., TRENT DAY, and KODIAK ROUSTABOUT, INC.,

did willfully fail to evaluate the mechanical integrity of an injection well by not conducting

pressure tests and alternative testing methods approved by the RRC, in that the Defendants failed

to conduct pressure tests at Aghorn Operating, Inc. leases in violation of 16 T.A.C. § 3.46(j)(1),

which is a regulation that is part of an EPA-approved UIC plan.

A violation of Title 42, United States Code, Section 300h-2, and Title 18, United States Code,

Section 2.

## COUNT NINE

### False Statements

50.     Paragraphs 1-3, 13-18, and 31-33 above are hereby realleged and incorporated by reference as if fully set forth herein.

51.     On various dates from in or about July 2017 to in or about October 2019, in the Western District of Texas and elsewhere, the Defendants,

AGHORN OPERATING, INC., TRENT DAY, and KODIAK ROUSTABOUT, INC.,

in a matter within the jurisdiction of the Environmental Protection Agency, an agency of the executive branch of the government of the United States, did knowingly and willfully make materially false, fictitious, and fraudulent statements and representations and make and use a false writing and document knowing the same to contain a materially false, fictitious, and fraudulent statement and entry:

(a) in "Form H-5s" submitted by Aghorn Operating, Inc., to the RRC signed by an Aghorn agent along with a "Certificate" stating:

> I declare under penalties prescribed in Sec. 91.143, Texas Natural Resources Code, that I am authorized to make this report, that this report was prepared by me or under my supervision and direction, and that data and facts stated herein are true, correct and complete, to the best of my knowledge.

In truth and in fact, as Defendants then well knew and believed, the pressure tests had not been conducted on the wells and the data and facts were not true, correct, and complete; and

(b) by submitting to the RRC false pressure recording charts containing false statements and representations regarding pressure tests.

A violation of Title 18, United States Code, Sections 1001 and 2.

14

## SENTENCING ALLEGATIONS

52.     With respect to the charges in this Indictment, for purposes of determining the maximum alternative fine pursuant to the Alternative Fines Act, 18 U.S.C. § 3571(d), the victims suffered losses of approximately $3,160,716.

A TRUE BILL.

Original Signed by the
Foreperson of the Grand Jury

FOREPERSON OF THE GRAND JURY

**TODD KIM**
**ASSISTANT ATTORNEY GENERAL**
**ENVIRONMENT and NATURAL RESOURCES DIVISION**

BY:

CHRISTOPHER J. COSTANTINI
Senior Trial Attorney

BY:

MARK T. ROMLEY
Trial Attorney

15