# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### MIDLAND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| | § | CRIMINAL NO. 7:22-CR-49 |
| v. | § | |
| | § | |
| AGHORN OPERATING, INC., | § | |
| TRENT DAY, and | § | |
| KODIAK ROUSTABOUT, INC. | § | |
| | § | |
| Defendants. | § | |

## DEFENDANTS AGHORN OPERATING, INC. AND TRENT DAY'S MOTION
## TO DISMISS COUNT TWO OF THE INDICTMENT
## FOR FAILURE TO STATE AN OFFENSE

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION & SUMMARY .................................................................... 1

BACKGROUND ........................................................................................... 3

    I.    Statutory and Regulatory Background ........................................... 3

    II.   Factual Background ........................................................................ 4

    III.  Count Two Allegations .................................................................. 6

LEGAL STANDARD .................................................................................... 8

ARGUMENT ................................................................................................ 9

    I.    Count Two Fails to Allege an Offense ......................................... 9

        A.    "Ambient Air" Means a Release into Publicly Accessible
            Portions of the Atmosphere External to Buildings ........................ 9

        B.    Congress Presumptively Intended the Regulatory Definition of
            "Ambient Air" to Apply to the Knowing Endangerment
            Provision ...................................................................................... 11

        C.    The Government Cannot Expand the Definition of
            "Ambient Air" to Include Air Within the Pump House ............... 13
            1.    *United States v. Ho* and Other Cases .................................... 13
            2.    The Government's Expanded Definition of Ambient
                 Air Violates Constitutional Due Process and Fair
                 Notice ................................................................................... 17
            3.    The Rule of Lenity Also Requires that the
                 Government's Expanded Definition of Ambient Air Be
                 Rejected ................................................................................ 18

CONCLUSION ........................................................................................... 19

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page**

*Alaska Wilderness League v. EPA*,
    727 F.3d 934 (9th Cir. 2013) ...................................................................... 15

*Benavidez v. Oil Patch Group, Inc.*,
    2022 WL 2903119 (W.D. Tex. Apr. 14, 2022) ......................................... 12

*Christopher v. SmithKline Beecham Corp.*,
    567 U.S. 142 (2012) ...................................................................................... 17

*Duarte v Mayorkas*,
    27 F.4th 1044 (5th Cir. 2022) ................................................................... 11

*Duncan v. Walker*,
    533 U.S. 167 (2001) ...................................................................................... 13

*Hibbs v. Winn*,
    542 U.S. 88 (2004) ........................................................................................ 14

*In re Hibbing Taconite Co.*,
    PSD Appeal No. 87-3 (U.S. Envtl. Prot. Agency July 19, 1989) ........................... 10

*Internal Revenue v. Lundy*,
    516 U.S. 235, 250 (1996) ........................................................................... 15

*Kolender v. Lawson*,
    461 U.S. 352 (1983) ...................................................................................... 17

*Lorillard v. Pons*,
    434 U.S. 575 (1978) ................................................................................. 11, 12

*Meredith v. Time Ins. Co.*,
    980 F.2d 352 (5th Cir. 1993) ..................................................................... 18

*NRDC v. EPA*,
    529 F.2d 755 (5th Cir. 1976) ..................................................................... 15

*Ratzlaf v. United States*,
    510 U.S. 135 (1994) ................................................................................ 11, 14

*Resisting Envtl. Destruction of Indigenous Lands, Redoil v. U.S. EPA*,
    716 F.3d 1155 (9th Cir. 2013) ...............................................................15

*Rewis v. United States*,
    401 U.S. 808 (1971)................................................................................19

*Sobranes Recovery Pool I, LLC v. Todd & Hughes Construction Corp.*,
    509 F.3d 216 (5th Cir. 2007) ................................................................13

*Staples v. United States*,
    511 U.S. 600 (1994)................................................................................14

*Sullivan v. Texas A&M University System*,
    986 F.3d 593 (5th Cir. 2021) ................................................................12

*Train v. NRDC*,
    421 U.S. 60, 65 (1975)............................................................................15

*Twp. of Montclair v. Ramsdell*,
    107 U.S. 147 (1883) ...............................................................................13

*United States v. Castleman*,
    572 U.S. 157 (2014) ...............................................................................12

*United States v. E.I. du Pont de Nemours & Co.*,
    No. 21-cr-16 (S.D. Tex. Aug, 18, 2022)................................................16

*United States v. Flores*,
    404 F.3d 320 (5th Cir. 2005) ..................................................................8

*United States v. Forkner*,
    No. 21-cr-268 (N.D. Tex. Feb. 8, 2022) ................................................8

*United States v. Ho*,
    No. H-00-13 (S.D. Tex. Nov. 17, 2000) ........................................passim

*United States v. Kaluza*,
    780 F.3d 647 (5th Cir. 2015) ..................................................................8

*United States v. Lanier,*
    520 U.S. 259 (1997)................................................................................18

*United States v. Margiotta*,
    No. 1:17-cr-00143 (D. Mont. Dec. 21, 2017) ....................................................... 16

*United States v. Moss*,
    872 F.3d 304 (5th Cir. 2017) ....................................................................... passim

*United States v. O'Connell*,
    2017 U.S. Dist. LEXIS 172491 (E.D. Wis. Sept. 5, 2017).................................. 16

*United States v. Onick*,
    889 F.2d 1425 (5th Cir. 1989) ............................................................................ 11

*United States v. Radley*,
    632 F.3d 177 (5th Cir. 2011) ............................................................................... 8

*United States v. Santos*,
    553 U.S. 507 (2008) .............................................................................................. 19

*United States v. W.R. Grace*,
    455 F. Supp. 2d 1172 (D. Mont. 2006) ............................................................... 15

*Yates v. United States*,
    574 U.S. 528 (2015) .............................................................................................. 12

**Statutes**                                                                       **Page**

42 U.S.C. § 7412(r)(6) ................................................................................... 18

42 U.S.C. § 7413 ............................................................................... 12, 18

42 U.S.C. § 7413(c)(5) ............................................................................. 1, 3, 9

**Other Authorities**

40 C.F.R. § 1604.2 ...................................................................................... 18

40 C.F.R. § 50.1(e) ............................................................................... passim

Fed. R. Crim. P. 12(b) ................................................................................. 8

H.R. REP. No. 101-40 ........................................................................... 3, 12

Accidental Release Reporting, 84 Fed. Reg. 67,899 (Dec. 12, 2019) ........................... 18

Letter from Douglas M. Costle, EPA Administrator, to Senator Jennings Randolph (Dec. 19, 1980) .................................................................................. 10

Letter from Gerald A. Emison, Director Office of Air Quality Planning and Standards to William F. O'Keefe, Vice President American Petroleum Institute (Jan. 22, 1986) ..... 10

Memorandum from Andrew Wheeler, EPA Administrator, to Regional Administrators, Revised Policy on Exclusions from "Ambient Air" (Dec. 2, 2019) ...................................................................................... 10

National Ambient Air Quality Standards ("NAAQS"). Pub. L. 91-604, § 109(a) (Dec. 31, 1970) .......................................................................... 3

## INTRODUCTION & SUMMARY

Aghorn Operating Inc. and Trent Day move to dismiss Count Two of the Indictment because it fails – on its face – to state an offense.

Count Two alleges the crime of "knowing endangerment," 42 U.S.C. § 7413(c)(5) – meaning the knowing release of an extremely hazardous substance into "ambient air" while knowingly creating an imminent danger of death or serious bodily injury. If this count goes to trial, we will challenge various elements, for example: there was no "knowing" release, and there was no "knowing" imminent danger of death or serious bodily injury. This motion challenges a different element: *the indictment fails to allege "ambient air" as a matter of law*.

This case involves two tragic deaths that occurred on October 26, 2019. That day, Jacob Dean and his wife Natalee Dean were overcome by a release of hydrogen sulfide inside a "pump house" building on a lease operated by Aghorn. As set out below, however, Count Two requires the release be into "ambient air," and the government's own regulations are clear that "ambient air" does not include the air inside a pump house building.

Specifically, 40 C.F.R. § 50.1(e) defines "ambient air" under the Clean Air Act as "that portion of the atmosphere, *external to buildings*, *to which the general public has access*." (Since promulgating that regulation, high EPA officials have explained that "ambient air" refers to outdoor air *beyond a facility's fence line*. *See infra* at 9.) Here, the release and deaths were *inside a building*, to which the public did not have access, inside the fence line.

1

This is not the first time that the DOJ has tried to expand "ambient air" beyond the EPA's published definition.  In *United States v. Ho*, No. H-00-13 (S.D. Tex. Nov. 17, 2000), United States District Judge Ewing Werlein rejected a similar attempt by the government to extend "ambient air" to include air inside a building, inside a fence line, contrary to EPA's long-established definition.   For the same reasons expressed in *Ho*, Count Two should be dismissed here.

## BACKGROUND

**I.     Statutory and Regulatory Background: EPA Defines "Ambient Air"**

In 1970, Congress passed the Clean Air Act (the "Act") to regulate air emissions from industrial sources.  At the time, the Act included what Congress dubbed National Ambient Air Quality Standards ("NAAQS"). Pub. L. 91-604, § 109(a) (Dec. 31, 1970) (codified at 42 U.S.C. § 7409(a)).  Congress also delegated to EPA the authority to make regulations to implement the Clean Air Act.  *See id.*

One year later in 1971, EPA promulgated a regulation[1] – 40 C.F.R. § 50.1(e) – which defined "**ambient air**" as "**that portion of the atmosphere, external to buildings, to which the general public has access**."

In 1990, Congress added a new section of the Act that provides for criminal penalties for "knowing endangerment" against:

> Any person who knowingly releases into the ambient air any . . . extremely hazardous substance . . . , and who knows at the time that he thereby places another person in imminent danger of death or serious bodily injury[.]

42 U.S.C. § 7413(c)(5)(A).

Congress debated two competing versions of the endangerment provisions.  The House version applied only to releases to the "ambient air," whereas the Senate version applied to releases to the "air" more generally.  *Compare* H.R. REP. No. 101-40 (accompanying H.R. 3030 (May 17, 1990)), 101st Cong., 2d Sess. 1990, 1990 WL 258792

---

[1] In the original Clean Air Act of 1970, the term "ambient air" was only used in the NAAQS.  *See generally*, Pub. L. 91-604 (Dec. 31, 1970).  The endangerment provision at issue in this motion was created by the 1990 Clean Air Act Amendments and used the same term.

(Leg. Hist:), *with* P.L. 101-549, Clean Air Act Amendments of 1990, § 701 (Section 113: Federal enforcement).  Ultimately, Congress rejected the Senate version and adopted the House version that was limited to releases to *ambient* air -- a term that had been defined by EPA regulation for almost two decades preceding the enactment of the endangerment provision in 1990.

## II.   Factual Background

Aghorn Operating, Inc. ("Aghorn") owns and operates oil wells and leases in Texas and has its principal office in Odessa, Texas.  Indictment (ECF No. 1) ¶ 1.  Trent Day, a chemical engineer, is Vice President of Aghorn. *Id.* ¶ 2.

In addition to oil, the wells produce water – called "produced water" – that contains hydrogen sulfide, also known as "H2S" – an acute toxic substance that can cause sudden death in the workplace.  *Id.* ¶ 19.  Aghorn operated a "water flood station" named the "Foster D," in Odessa ("the Station").  *Id.* ¶ 21.  The Station received produced water from various oil leases and injected the water back into the wells.  *Id.*

The indictment alleges:

### The Deaths of Jacob and Natalee Dean

25.   On October 26, 2019, at approximately 6:51 p.m., Jacob Dean, an employee of Aghorn, responded to a call to check the pump house, an enclosed building with two bay doors at the Station. His wife, Natalee Dean, knew where Jacob had gone, and started calling him when he did not return in a timely manner. When those calls went unanswered, Natalee drove to the Station with her two children, aged nine and six, arriving at approximately 9:30 p.m.

26.   A pump had failed in the pump house, causing a leak of produced water containing H2S. Jacob had been overcome by H2S in the pump house, and when Natalee arrived at the Station, she exited the vehicle and proceeded to the pump

house, where she too was overcome by the gas. Both Jacob and Natalee were found dead by the first responders to the scene.

*Id.* ¶ 25-26.

Figure 1 shows the rectangular pump house, within a chain link fence, within another fence around the Aghorn property, and an entrance gate on West 49th Street.

**Figure 1 – Aerial image of Aghorn Waterflood Station – Taken by the U.S. Chemical Safety Board**



Figure 2 shows the same area with a wider view from Google Maps:

**Figure 2 – Google Maps Image of Area
Surrounding Waterflood Station**



### III.    Count Two Allegations

Count Two alleges that Aghorn and Trent Day knowingly placed a person in imminent danger of death or serious bodily injury by knowingly releasing hydrogen sulfide into the "ambient air" on various dates from April 2017 to October 26, 2019.  Indictment ¶ 37.  Count Two incorporates by reference paragraphs 25-26 quoted above – which identify that Jacob and Natalee Dean were exposed to H2S and died inside the building. *Id.* ¶¶ 25-26, 36.[2]

---

[2] Paragraph 29 of the Indictment also alleges that the next day, when the Fire Department returned, they "detected elevated H2S readings outside the pump house bay doors[.]"  *Id.* ¶ 29.  However, the indictment does not allege that anyone other than Jacob and Natalee were placed at risk of imminent danger of death or serious bodily injury at any time or location.  While a motion to dismiss should not rely on disputed facts,  we do not believe that there is any legitimate factual dispute on this key issue: the "imminent danger of death and serious bodily injury" in Count Two was to Jacob and Natalee on October 26.

## LEGAL STANDARD FOR MOTION TO DISMISS

A defendant may "raise by pretrial motion any defense . . . that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b).  Pretrial dismissal of an indictment, although not common, is appropriate where the indictment makes factual allegations that if taken as true would require dismissal, and where the motion to dismiss turns on a question of law.  *See, e.g.*, *United States v. Moss*, 872 F.3d 304, 315 (5th Cir. 2017) (*affirming pretrial dismissal* of charges under the Outer Continental Shelf Lands Act, concluding that the law does not apply to "contractors"); *United States v. Kaluza*, 780 F.3d 647, 653, 657-69 (5th Cir. 2015) (*affirming pretrial dismissal* of "seaman's manslaughter" charges in the BP Deepwater Horizon Blowout case, concluding that the law applies only to categories of employees listed in the statute (i.e., the "captain or pilot" of the ship) and not to "drillers"); *United States v. Radley*, 632 F.3d 177, 184 (5th Cir. 2011) (*affirming pretrial dismissal* of indictment alleging commodities manipulation when the commodity trades fit within a statutory exception); *United States v. Forkner,* No. 21-CR-268 (N. D. Tex. Feb. 8, 2022) (O'Connor, J.) (Memorandum Opinion) (dismissing two counts of the Boeing 737MAX indictment because "computer software" is not an "aircraft part" as defined in 18 U.S.C. § 38 (attached as Exhibit 1); *United States v. Flores*, 404 F.3d 320, 324 n.6 (5th Cir. 2005) (holding that a "district court may make preliminary findings of fact necessary to decide the questions of law presented by pre-trial motions so long as the court's findings on the motion do not invade the province of the ultimate finder of fact" (citation omitted)).

## ARGUMENT

### I.      Count Two Fails to Allege an Offense

As defined by EPA regulation for purposes of the Clean Air Act, "ambient air" means that portion of the atmosphere, *external* to buildings, to which the general public has access.  EPA officials have repeatedly confirmed that "public" access means the area *outside* the fence line of a site.  Count Two, however, alleges two deaths occurring not only within the company's fence line but *inside* the pump house building.  It does not allege imminent danger outside of a building (much less outside the fence line), and therefore, Count Two fails to allege an offense and should be dismissed.

### A.      "Ambient Air" Means a Release into Publicly Accessible Portions of the Atmosphere External to Buildings

"Ambient air" is an element of Count Two of the Indictment.   42 U.S.C. § 7413(c)(5)(A) ("Any person who knowingly releases into the ambient air any . . . extremely hazardous substance . . . ,  and who knows at the time that he thereby places another person in imminent danger of death or serious bodily injury shall, upon conviction, be punished[.]").  As mentioned above, Congress debated – and rejected -- applying the offense to all "air" rather than only "*ambient* air," and EPA's definition of "ambient air" was long on the books (since 1971): "ambient air" is "that portion of the atmosphere, *external to buildings, to which the general public has access*."  40 C.F.R. § 50.1(e) (emphasis added).  In guidance after 1971, EPA officials clarified that areas to which "the general public has access" means the atmosphere *outside the fence line or other physical barrier*, since "access" is the ability to enter.  *See* Letter from Douglas M. Costle, EPA

Administrator, to Senator Jennings Randolph (Dec. 19, 1980) (stating that "the exemption from ambient air is available only for the atmosphere over land owned or controlled by the source and to which public access is precluded by a fence or other physical barriers") (attached as Exhibit 2).

EPA consistently reaffirmed this definition of "ambient air" over the decades. *See, e.g.,* Letter from Gerald A. Emison, Director, Office of Air Quality Planning and Standards to William F. O'Keefe, Vice President American Petroleum Institute (Jan. 22, 1986) ("Let me assure you there is no change in our long-standing national policy with regard to the definition of ambient air," and referring to the Letter from Douglas M. Costle) (attached as Exhibit 3); *In re Hibbing Taconite Co.*, PSD Appeal No. 87-3 at 16 (U.S. Env. Prot. Agency July 19, 1989) ("EPA policy has allowed exclusion [from ambient air quality modeling] if public access is *barred by fence or other physical barrier*." (emphasis added)); *id.* at 17 ("[T]he test for ambient air exclusion *does not require a continuous fence* around the perimeter of the property. Other types of physical barriers can effectively preclude access." (emphasis added)) (attached as Exhibit 4).

In 1990, Congress amended the Clean Air Act and added the provision at issue in Count Two. Congress crafted no new definition of "ambient air" as part of that amendment, and EPA subsequently reaffirmed its definition that "ambient air" encompasses only air that is external to a building and outside a fence line. See Memorandum from Andrew Wheeler, EPA Administrator, to Regional Administrators, Revised Policy on Exclusions from "Ambient Air" at 1 (Dec. 2, 2019) (attached as Exhibit 5). The 2019 Memorandum clarified that companies need not even have a physical "fence"

to establish a "fence line."  *See id.* at 1.  "[T]he atmosphere over land owned or controlled by the stationary source may be excluded from ambient air where the source employs measures, which may include physical barriers, that are effective in precluding access to the land by the general public."  *Id.*

### B.   Congress Presumptively Intended the Regulatory Definition of "Ambient Air" to Apply to the Knowing Endangerment Provision

When Congress amended the Clean Air Act in 1990 and added the endangerment provision at issue in Count Two, EPA's definition of "ambient air" had been established for 21 years.  Under these circumstances, Congress is presumed to have known the long-standing regulatory definition and to have incorporated its meaning into the newly enacted statute using the same term.  *Cf. Lorillard v. Pons*, 434 U.S. 575, 580-81 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change[.]") (internal citations omitted) *applied in, e.g., Duarte v. Mayorkas*, 27 F.4th 1044, 1059 (5th Cir. 2022).

This is true even though the EPA's definition was initially promulgated in the context of NAAQS.  "It is a hornbook principle of interpretation that when 'two provisions operate *in pari materia*,' they 'should not be read in isolation,' but must be construed together."  *Moss*, 872 F.3d at 310 (quoting *United States v. Onick*, 889 F.2d 1425, 1433 (5th Cir. 1989)).  "A term appearing in several places in a statutory text is generally read the same way each time it appears."  *Ratzlaf v. United States*, 510 U.S. 135, 143 (1994).  This is particularly true where, as here, the definition of the term was long established when Congress used it in the endangerment provision.

In other cases, the government has advanced the observation of the plurality opinion *Yates v. United States*, 574 U.S. 528, 537 (2015), that "the same words, placed in different contexts, sometimes mean different things." And *sometimes* they do – but under "the presumption of consistent usage, a term *generally* means the same thing each time it is used." *Benavidez v. Oil Patch Group, Inc.*, 2022 WL 2903119, at \*5 (W.D. Tex. Apr. 14, 2022) (Counts, J.) (emphasis added; quoting *United States v. Castleman*, 572 U.S. 157, 174 (2014) (Scalia, J., concurring)). The "contexts" here are not "different"; they are the same: both NAAQS (§§ 7409-7410) and the "federal enforcement" provision (§ 7413) are found cheek by jowl in Part A (out of four Parts) of Title I (out of seven Titles) of the Clean Air Act, 42 U.S.C. §§ 7401-7671q.

Further, the presumption in *Lorillard v. Pons* is even stronger in this case because two competing versions of the endangerment provision were before Congress. The Senate proposed a broader version of the negligent endangerment provision – all "air" rather than "*ambient* air" – but Congress adopted the narrower House version. *Compare* H.R. REP. No. 101-40 (accompanying H.R. 3030 (May 17, 1990)), 101st Cong., 2d Sess. 1990, 1990 WL 258792 (Leg. Hist:), *with* P.L. 101-549, Clean Air Act Amendments of 1990, § 701 (Section 113: Federal enforcement). As Judge Werlein recognized in *Ho*, Congress obviously intended the word "ambient" to have some meaning, and a court may not enforce the Senate bill that was rejected for the House bill that passed. *See infra* at 13-14. To the contrary, courts must "refuse to render meaningless the words Congress *did* choose," because it is their "'duty to give effect, if possible, to every clause and word of a statute.'" *Sullivan v. Texas A&M University System*, 986 F.3d 593, 597-98 (5th Cir. 2021) (quoting

*Duncan v. Walker*, 533 U.S. 167, 174 (2001)), *cert. denied*, 142 S. Ct. 216 (2021); *see also Twp. of Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883) (Courts should "give effect, if possible, to every clause and word of a statute, avoiding, if it may be, any construction which implies that the legislature was ignorant of the meaning of the language it employed."). *quoted in Sobranes Recovery Pool I, LLC v. Todd & Hughes Construction Corp.*, 509 F.3d 216, 222 n.15 (5th Cir. 2007).

Thus, the fatal release in the Aghorn pump house did not occur in the "ambient air."

## C. The Government Cannot Expand the Definition of "Ambient Air" to Include Air Within the Pump House

### 1. *United States v. Ho* and Other Cases

Over twenty years ago, District Judge Ewing Werlein recognized in *United States v. Ho* that ambient air – in an endangerment crime – means air outside a building and outside the fence line of the facility. Defendant Eric Ho was charged with nine environmental violations for mishandling asbestos. Count 5 charged "endangerment," because workers who were renovating the inside of a building were exposed to the hazardous substance. The government proposed to call an expert medical witness to explain that the release caused an imminent threat to the workers inside the building, and the defense objected on relevance grounds because "ambient air" did not include air inside a building. *See Ho,* Defendant's Memorandum of Law Concerning Ambient Air, ECF No. 81 at 6-20; 35-36 (attached as Ex. 6-C). Following a hearing (*Ho*, ECF Nos. 83 and 87), and government briefing (*Ho*, ECF No. 90), Judge Werlein agreed with the defense and excluded the government's expert (*Ho*, ECF Nos. 92 and 94). *See* Exhibit 6-D, E, F, G, H.

Judge Werlein concluded that the government's interpretation of "ambient air" violated the fundamental rules of statutory construction.  First, citing 40 C.F.R. § 50.1(e), Judge Werlein noted that the EPA's own regulation defines "ambient air" to exclude air inside a building.  *Ho,*  Transcript of Hearing on *Daubert* Motions at 7 (attached as Exhibit 6-H).  T h e n ,  the court rejected the government's broader reading – that "ambient air" means "any surrounding air."  "If ambient air means [any] air, then the modifying adjective 'ambient' thus becomes superfluous."  *Id.; see also Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.") (citation omitted); *Ratzlaf*, 510 U.S. at 140-41 (concern for treating words as surplusage "should be heightened when the words describe an element of a criminal offense").

Going further, Judge Werlein explained that, at very least, the term "ambient air" is ambiguous, and must be construed against the government. *Ho,* Transcript of Hearing on *Daubert* Motions at 7 (attached as Exhibit 6-H) ("[U]nder the rule of lenity an ambiguous criminal statute is to be construed in favor of the accused.") (*citing Staples v. United States*, 511 U.S. 600, 619, n.17 (1994)).  For this reason, the government could not expand the meaning of "ambient air" to reach air inside a fence line, much less inside a building.

The government then urged the court to admit evidence of the hazard "inside" the building to prove the level of danger "outside."  The Court rejected this as well: dangerous air inside a building does not establish the level of danger present in the public ambient air outside the fence line.  *Id.* at 8-9.  As a result, Judge Werlein excluded expert testimony about conditions inside a building as not relevant to the "ambient air."  With that ruling,

14

the government dismissed the count.  *Id.*; *see also Ho,* Gov't Motion to Dismiss Count

Five, ECF No. 100, granted on Jan. 26, 2001 (Pretrial Conference Minutes, *Ho*, ECF

No.122) (attached as Exhibit 6-I, J).

In a more recent "knowing endangerment" case, *United States v. W.R. Grace*, 455

F.Supp.2d 1172, 1174-75 (D. Mont. 2006), the court similarly held that "ambient air" has

the definition supplied at 40 C.F.R. § 50.1(e) because Congress chose to use the same term

that was used in the NAAQS without supplying a new definition, and "identical words used

in different parts of the same act are intended to have the same meaning" (quoting *Internal*

*Revenue v. Lundy*, 516 U.S. 235, 250 (1996)).   As in *Ho*, the court granted a motion to

exclude evidence of indoor air releases for the purpose of showing a release to the ambient

air.  *See W.R. Grace*, 455 F.Supp.2d at 1177.

Civil cases have likewise held that "ambient air" has the meaning in 40 C.F.R. §

50.1(e).  *See, e.g.*, *Train v. NRDC*, 421 U.S. 60, 65 (1975) ("'ambient air' [] is the statute's

term for the outdoor air used by the general public."); *NRDC v. EPA*, 529 F.2d 755, 756,

n.3 (5th Cir. 1976) (defining "ambient air" according to 40 C.F.R. § 50.1(e)); *Alaska*

*Wilderness League v. EPA*, 727 F.3d 934, 936 (9th Cir. 2013) ("ambient air" generally

means "beyond the fence line" air and does ***not*** include "the atmosphere over land

owned or controlled by the source and to which public access is precluded by a fence or

other physical barriers"); *Resisting Envtl. Destruction of Indigenous Lands, Redoil v. U.S.*

*EPA*, 716 F.3d 1155, 1165 (9th Cir. 2013) (relying on the regulatory definition at 40 C.F.R.

§ 50.1(e)).

Courts have rejected even less ambitious attempts by the government to expand the definition of "ambient air" in endangerment cases under the Act. In 2017, the government charged a company executive with "knowing endangerment" in federal court in Montana for releasing hydrocarbon vapors inside a building that led to an explosion injuring employees. The indictment alleged that "eight large overhead doors" of the building were routinely kept open, and that employees had expressed a concern that they "run the risk of killing someone, not only our operators but also customers." *See United States v. Margiotta*, No. 1:17-cr-00143 (D. Mont. Dec. 21, 2017), Indictment at 4-6 (ECF No. 5) (attached as Exhibit 7-A). The government alleged that at the time of the incident, the overhead doors of the building were open and a truck was making a delivery. *See id.* at 5-6. The government requested a jury instruction that defined "ambient air" as "that portion of the atmosphere *not completely enclosed in a building or structure*" – trying to apply the definition to a building with large open doors. *Margiotta,* United States' Proposed Jury Instructions at 55, ECF No. 104 (Sept. 16, 2019) (emphasis added) (attached as Exhibit 7-B). Instead, the court instructed that "ambient air" means "outdoor air external to buildings and accessible to the general public." *See Margiotta*, Given Jury Instructions at 51, ECF No. 127 (Sept. 30, 2019) (attached as exhibit 7-C).[3]

---

[3] Against all this authority, we find only one Clean Air Act case that assigned "ambient air" a different meaning. *See United States v. O'Connell*, Case No. 17-CR-50 (E.D. Wis. Oct. 17, 2017) (attached as Exhibit 8). That out-of-circuit decision is inconsistent with this Circuit's approach to statutory interpretation set forth in *Moss*. 872 F.3d at 315. Most recently, the District Court in Houston considered the meaning of "ambient air" in *United States v. E.I. du Pont de Nemours & Co.*, No. 21-CR-16, Doc. 65, at 27-27 (S.D. Tex. Aug. 18, 2022). The court did not resolve the issue raised here because of a key factual distinction: "Even if 'ambient air' is limited to air 'beyond the fence line' of DuPont's facility, the indictment sufficiently alleged that the release travelled *outside the facility* and *beyond the fence line*." *Id.* at 27.

### 2.     The Government's Expanded Definition of Ambient Air Violates Constitutional Due Process and Fair Notice

A criminal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

Assigning "ambient air" a meaning other than the one in 40 C.F.R. § 50.1(e) that has applied for the last 50 years would present grave fair notice concerns. *See, e.g.*, *Moss,* 872 F.3d at 310-13; *cf. Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158 (2012) (declining to defer to an agency's change of interpretation of its own regulation because of "the potential for unfair surprise"). In *Moss*, the government sought to impose criminal liability for knowing violations of Outer Continental Shelf Lands Act ("OCSLA") regulations on "contractors" where the language of the statute, supporting regulations, legislative history, and agency guidance said the regulations applied to "lessees" and "operators," but not to contractors. *Moss*, 872 F.3d at 310-13. The contractors moved to dismiss the OCSLA-related charges, arguing that they could not be held criminally liable under the Act or its implementing regulations. The district court agreed with the contractors and dismissed their OCSLA counts, and the Fifth Circuit affirmed, because the applicable regulatory definition "excludes contractors," and there was no judicial precedent to expand the scope of the statute to include them. *Id.* at 314-16.

Here, like in *Moss*, the government seeks to impose criminal penalties by contradicting its own regulatory definition, without providing the kind of notice that due

process requires, such as a statutory amendment, notice-and-comment rulemaking, or prior judicial decision. *See United States v. Lanier*, 520 U.S. 259, 266 (1997) ("[D]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope.").[4]

### 3. The Rule of Lenity Also Requires that the Government's Expanded Definition of Ambient Air Be Rejected

The expanded definition of ambient air used in the Indictment is clearly at odds with the regulatory definition that has been in effect for the past five decades. When the government pushed a similar position 21 years ago, Judge Werlein struck it down recognizing that the term "ambient air" is at best ambiguous and must therefore be construed in the defendant's favor. Transcript of Hearing on *Daubert* Motions at 7, *United States v. Ho*, ECF No. 94 (attached as Exhibit 6-H). The passage of time has not changed

---

[4] In 2020, the U.S. Chemical Safety Board ("CSB"), an independent federal agency that investigates industrial accidents, issued a regulation intentionally adopting a broader definition of "ambient air" than EPA's definition for the purposes of identifying accidental releases required to be reported to CSB. *See* 40 C.F.R. § 1604.2 ("Ambient air means any portion of the atmosphere inside or outside a stationary source."); Accidental Release Reporting, 84 Fed. Reg. 67,899, 67,905 (Dec. 12, 2019). CSB's mission is to conduct root cause investigations of chemical accidents and, unlike EPA, CSB has no enforcement authority under the Clean Air Act. *Compare* 42 U.S.C. § 7412(r)(6) *with* 42 U.S.C. § 7413. The rule of lenity and the constitutional principle of fair notice dictate that CSB's rulemaking should have no bearing on how "ambient air" is interpretated in this case. First, the Aghorn accident occurred in 2019 before CSB promulgated its regulatory definition in 2020. Second, the regulatory definition provided by EPA, the agency Congress delegated enforcement authority to, is controlling for fair notice purposes. *Cf. Meredith v. Time Ins. Co.*, 980 F.2d 352, 355 (5th Cir. 1993) ("to the extent Congress has failed to state its intention on the precise issue in question, we refer to permissible interpretations *by the agency charged with administering the statute*" (emphasis added)). Third, the purpose of CSB's regulation (accidental release reporting) is different from criminal enforcement under the knowing endangerment provision of the Clean Air Act and thus CSB's definition of "ambient air" is not relevant for the purposes of a criminal prosecution.

this outcome.  In fact, EPA reiterated and reaffirmed its definition in 2019.  *See* Exhibit 5.
At a minimum, the regulatory definition of "ambient air" is reasonable here: it accords with
the agency's long-standing interpretation, as well as the overwhelming majority of
authorities interpreting the provision.  Even if the government proposed a definition that
was also reasonable, the term is—at very least—ambiguous.   Under the rule of lenity,
"ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity,"
*Rewis v. United States*, 401 U.S. 808, 812 (1971); *see also United States v. Santos*, 553 U.S.
507, 514 (2008) (plurality) (Scalia, J.) ("The rule of lenity requires ambiguous criminal laws
to be interpreted in favor of the defendants subjected to them.").

If Congress had intended to criminalize knowing releases into any air, indoor or
outdoor, inside or outside a company's fence line, it could easily have done so when
enacting the endangerment provision as part of the 1990 Clean Air Act Amendments.  It
did not; instead, it rejected the broader Senate version of this provision.  Unless and until
Congress explicitly defines ambient air to mean something other than the prevailing
regulatory definition, the term must be construed narrowly for the benefit of the defendant.

## CONCLUSION

Aghorn and Trent Day move to dismiss Count Two of the Indictment for failure to
allege an offense.

19

Respectfully submitted,

/s/ David Gerger
David Gerger
Bar No. 07816360
dgerger@ghmfirm.com
Matt Hennessy
Bar No. 00787677
mhennessy@ghmfirm.com
GERGER HENNESSY & MARTIN
700 Louisiana, Suite 2300
Houston, Texas 77002
Tel: (713) 224-4400
Fax: (713) 224-5153


/s/ Marla Poirot
Marla Poirot
Bar No. 00794736
marla@poirotlaw.com
THE POIROT LAW FIRM, PLLC
PO Box 25246
Houston, Texas 77265
Tel: (713) 816-1660

**ATTORNEYS FOR DEFENDANT
AGHORN OPERATING**


/s/Daniel Hurley
Daniel Hurley
Bar No. 10310200
dwh@hurleyguinn.com
HURLEY, GUINN & SINGH
1805 13th Street
Lubbock, Texas 79401
Tel: (806) 771-0700
Fax: (806) 763-8199

/s/Brian Carney
Brian Carney
Bar No. 03832275
Brian@carneylawfirm.net
ATTORNEY AT LAW
1202 W. Texas Ave.
Midland, TX 79701
Tel: (432) 686-8300
Fax: (432) 686-1949

**ATTORNEYS FOR TRENT DAY**

## CERTIFICATE OF SERVICE

I filed this motion in the Court's electronic filing system and am emailing a copy to the prosecution the day of filing.

_/s/ David Gerger_
David Gerger

## CERTIFICATE OF CONFERENCE

The United States opposes this motion, and the parties will confer and communicate with the Court about a requested briefing schedule.

_/s/ David Gerger_
David Gerger