IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION

UNITED STATES OF AMERICA

v.                                                    NO. 7:22-CR-00049-DC

(1) AGHORN OPERATING, INC., et al.

**UNITED STATES' OPPOSITION TO DEFENDANTS AGHORN
OPERATING, INC. AND TRENT DAY'S MOTION TO DISMISS COUNT
ONE OF THE INDICTMENT FOR VAGUENESS**

I.      **INTRODUCTION**

The General Duty Clause of the Clean Air Act is both understandable and necessary to protect the safety of employees and the public. It easily passes constitutional muster since it provides fair notice of the prohibited conduct as well as clear and enforceable standards.

These facts trigger an "as applied" vagueness analysis precluding a pre-trial granting of this Motion. Instead, it must be decided in the context of the evidence presented at trial, and therefore should be denied on that basis alone.

Any subsequent or re-filed vagueness motion will also fail. The oilfields of west Texas have some of the highest known concentrations of hydrogen sulfide, a fact which is widely understood in the Permian Basin. This gas is deadly as exemplified in this case, where in an instant, it killed a hard-working husband and his wife and left two young children orphans. Not surprisingly, it is heavily regulated, and the Defendants flouted those regulations. These Defendants knew they were required to maintain a safe facility and protect their workers and the public from the dangers of hydrogen sulfide.

The statute at issue here requiring a safe facility and the prevention of releases was

tailored for this very situation: a recalcitrant company knowingly emitted a highly toxic gas for years, ultimately killing two people, endangering many others, and making itself a general nuisance in the community. Whatever opinions exist as to the specificity of the statutory language, it surely put these defendants on notice as to what was prohibited.

## II.    <u>BACKGROUND</u>

The Indictment charged crimes related to emissions of hydrogen sulfide (H2S), an extremely hazardous substance that is the leading cause of sudden death in the workplace. (Indictment, Doc. 1 at 8-9). Jacob Dean and his wife Natalee were killed by this poisonous gas on October 26, 2019. (<u>Id.</u> at 6-7).

Under the Clean Air Act (CAA) any person who knowingly violates the general duty imposed by 42 U.S.C. § 7412(r)(l) has committed a crime. 42 U.S.C. § 7413(c)(l) ("General Duty Clause" or "GDC"). Count One of the Indictment alleges a violation of the GDC, specifically that between in or about April of 2017 to on or about October 26, 2019, defendants Aghorn Operating, Inc. and Trent Day:

> as owners and operators of a stationary source producing, processing, handling, and storing an extremely hazardous substance, to wit: hydrogen sulfide, knowingly violated their general duty to prevent the accidental release of the extremely hazardous substance into the ambient air from the stationary source, by failing to design and maintain a safe facility, to take such steps as are necessary to prevent releases, and to minimize the consequences of accidental releases which do occur.

(Indictment, Doc. 1 at 8-9).

On November 21, 2022, these Defendants filed a motion to dismiss this charge, contending that the General Duty Clause "is unconstitutionally vague." (Motion, Doc. 29). It lacks merit.

### III.    ARGUMENT

A.    Vagueness Challenges Like This One Are Evaluated "As Applied" to the Defendant (Rather than as a Facial Challenge) and Face a High Bar

A claim that a statute is "void for vagueness" is an outgrowth of the Due Process Clause of the Fifth Amendment in the Constitution. United States v. Williams, 553 U.S. 285, 304 (2008); United States v. McRae, 702 F.3d 806, 836 (5th Cir. 2012). A statute fails to comport with due process if it does not provide a person of ordinary intelligence fair notice of what is prohibited or is so standardless that it authorizes or encourages seriously discriminatory enforcement. Williams, 553 U.S. at 304; McRae, 702 F.3d at 837.

A defendant making a vagueness challenge faces a high bar, as there is a "strong presumptive validity that attaches to an Act of Congress." United States v. National Dairy Products Corp., 372 U.S. 29, 32 (1963). The Supreme Court has "consistently sought an interpretation which supports the constitutionality of legislation." Parker v. Levy, 417 U.S. 733, 757 (1974). Courts should not "needlessly confront[]" constitutional issues and every reasonable construction must be resorted to in order to save a statute from unconstitutionality. Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council, 485 U.S. 568, 575 (1988); Skilling v. United States, 561 U.S. 358, 403 (2010); see also A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts § 38, p. 247 (2012) ("[a] statute should be interpreted in a way that avoids placing its constitutionality in doubt").

The Supreme Court has warned against judicial encroachment into legislative authority:

> When the subject lies within the police power of the state, debatable questions as to reasonableness are not for the courts but for the Legislature, which is entitled to form its own judgment, and its action within its range of discretion cannot be set aside because compliance is burdensome.

Sproles v. Binford, 286 U.S. 374, 388-89 (1932). "[T]he judiciary may not sit as a

superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." City of New Orleans v. Dukes, 427 U.S. 297, 303 (1976).

Unless a vagueness challenge involves First Amendment rights, the statute must be examined as applied, that is "in the light of the facts of the case at hand." United States v. Mazurie, 419 U.S. 544, 550 (1975). In other words, the analysis is how the statute applies to a particular defendant. Nat'l Dairy Prods. Corp., 372 U.S. at 33 ("a statute must of necessity be examined in the light of the conduct with which a defendant is charged"); United States v. Edwards, 182 F.3d 333, 335 (5th Cir. 1999) ("when a vagueness challenge does not involve First Amendment freedoms, we examine the statute only in light of the facts of the case at hand"); United States v. Gray, 96 F.3d 769, 776-77 (5th Cir. 1996).

In employing this "as applied" vagueness standard, a party "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others."[1] Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 (1982); United States v. Clark, 582 F.3d 607, 613 (5th Cir. 2009); Roark & Hardee LP v. City of Austin, 522 F.3d 533, 546 (5th Cir. 2008). "A court should therefore examine the complainant's conduct before analyzing other hypothetical applications of the law." Hoffman

---

[1] These settled principles were left untouched by Johnson v. United States, 576 U.S. 591 (2015) (now defunct residual clause of the Armed Career Criminal Act ("ACCA") impermissibly vague) and Sessions v. Dimaya, —— U.S. ——, 138 S. Ct. 1204 (2018). Neither case "explicitly question[ed] the rule that a litigant whose conduct is clearly prohibited by a statute cannot be the one to make a facial vagueness challenge." United States v. Hasson, 26 F.4th 610, 620 (4th Cir. 2022); quoting Kashem v. Barr, 941 F.3d 358, 376 (9th Cir. 2019). Johnson's reach and precedential impact is limited due to its "unique context" and "a statute that is in key respects sui generis." United States v. Cook, 970 F.3d 866, 876-77 (7th Cir. 2020). The Fifth Circuit was clear that "Johnson did not change the rule that a defendant whose conduct is clearly prohibited cannot be the one making that challenge." United States v. Westbrooks, 858 F.3d 317, 325 (5th Cir. 2017), judgment vacated on other grounds, —— U.S. ——, 138 S. Ct. 1323 (2018). Since Johnson, the Supreme Court has continued to apply the rule that a plaintiff whose conduct is clearly proscribed cannot raise a facial vagueness claim. Expressions Hair Design v. Schneiderman, 581 U.S. 37, 137 S. Ct. 1144, 1151-52 (2017).

Estates, 455 U.S. at 495; see also United States v. McRae, 702 F.3d at 837-38 (rejecting argument about notice furnished to "other hypothetical defendants"). The issue is whether the statute is unconstitutionally vague on the specific facts of the case. United States v. Brooks, 681 F.3d 678, 696 (5th Cir. 2012) ("vagueness challenge must be evaluated in light of the proven conduct"); United States v. Daniels, 247 F.3d 598, 600 (5th Cir. 2001); United States v. Edwards, 182 F.3d 333, 335 (5th Cir. 1999) ("we examine the statute only in light of the facts of the case at hand").

Reviewing vagueness claims against the backdrop of the conduct of the complaining party is deeply embedded in constitutional adjudication, goes to the core role of the judiciary, and "reflect[s] the conviction that under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws." Broadrick v. Oklahoma, 413 U.S. 601, 610-11 (1973). Constitutional rights, after all, "are personal and may not be asserted vicariously," and judgments "are justified only out of the necessity of adjudicating rights in particular cases between the litigants brought before the Court." Id., citing Marbury v. Madison, 1 Cranch 137, 178, 2 L.Ed. 60 (1803). "[I]t would indeed be undesirable for this Court to consider every conceivable situation which might possibly arise in the application of complex and comprehensive legislation." Gonzalez v. Carhart, 550 U.S. 124, 168 (2007), quoting United States v. Raines, 362 U.S. 17, 21 (1960).

Very general statutory terms have withstood constitutional scrutiny in the Fifth Circuit, which found, for example, that while "immoral purposes" may be "imprecise" it surely was not "incomprehensible." Clark, 582 F.3d at 614 (internal quotations and brackets omitted); see also, Ryder Truck Lines v Brennan, 497 F.2d 230, 233 (5th Cir. 1974) ("[a]lthough the regulation may not be a model of perfect precision, we do not believe that its imprecision renders it

constitutionally infirm"). Other examples abound of broad terms surviving vagueness attacks including "any offensive, derisive or annoying word," "connected with or related to the national defense," "psychopathic personality," "fair and open competition," "unreasonable waste of natural gas," and "range usually occupied by any cattle grower." Clark, 582 F.3d at 614-15 n.11; see also, United States v. Monroe, 178 F.3d 304, 308-309 (5th Cir. 1999) ("maliciously damag[ing] or destroy[ing]" not unconstitutionally vague); J & B Entertainment, Inc. v. City of Jackson, Miss., 152 F.3d 362, 368 (5th Cir. 1998) ("serious literary, artistic, scientific or political value" not void for vagueness, adding that "we can never expect mathematical certainty from our language"); United States v. Ritchey, No. 1:21-cr-6, -- F.Supp.3d --, 2022 WL 1645801 at *8-11 (S.D. Miss., May 24, 2022) (in a criminal case, "prevailing market price" not unconstitutionally vague); United States v. Vogel, No. 4:08-CR-224, 2009 WL 10673439 at *3-4 (E.D. Texas, September 2, 2009) ("legitimate medical purpose" in criminal case not void for vagueness).

In finding that broad terms can satisfy constitutional requirements, the Fifth Circuit follows longstanding precedent from the Supreme Court, including holding in a criminal case that the term "so far as practicable, and, where feasible," was not vague. Boyce Motor Lines v. United States, 342 U.S. 337 (1952). In a case involving a hazardous materials transportation law, the Court stressed the need for flexibility and "the practical necessities of discharging the business of government" in crafting laws protecting the public safety:

> A criminal statute must be sufficiently definite to give notice of the required conduct to one who would avoid its penalties, and to guide the judge in its application and the lawyer in defending one charged with its violation. But few words possess the precision of mathematical symbols, most statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions. Consequently, no more than a reasonable degree of certainty can be demanded.

Id. at 340. Likewise, the Court approved the use of general and ordinary statutory language in

finding "shortest practicable route" acceptable:

> "Shortest practicable route" is not an expression too vague to be understood. The requirement of reasonable certainty does not preclude the use of ordinary terms to express ideas which find adequate interpretation in common usage and understanding. . . . The use of common experience as a glossary is necessary to meet the practical demands of legislation.

Sproles, 286 U.S. at 393; United States v. Powell, 423 U.S. 87, 94 (1975) (fact that Congress could have chosen clearer language does not mean statute is unconstitutionally vague); Nat'l Dairy Prods. Corp., 372 U.S. at 32 ("statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language").

Theoretical "close cases" that can be envisioned under a general statutory term do not make it vague, since that problem is addressed by the beyond a reasonable doubt standard at trial. Williams, 553 U.S. at 305-06. Justice Scalia stressed this point:

> But the Eleventh Circuit's error is more fundamental than merely its selection of unproblematic hypotheticals. Its basic mistake lies in the belief that the mere fact that close cases can be envisioned renders a statute vague. That is not so. Close cases can be imagined under virtually any statute. The problem that poses is addressed, not by the doctrine of vagueness, but by the requirement of proof beyond a reasonable doubt.

Id.; see also Boyce Motor Lines, 342 U.S. at 343 (argument supporting claimed vagueness was "plainly a matter for proof at the trial. We are not so conversant with all the routes in that area that we may, with no facts in the record before us, assume the allegations of the indictment to be false").

A scienter requirement that a defendant engage in knowing conduct alleviates vagueness concerns. McFadden v. United States, 576 U.S. 186, 197 (2015); Gonzalez v. Carhart, 550 U.S. at 149; United States v. Barton, 418 F.Supp.3d 134, 138 (E.D. La. 2019); Cortes v. City of

Houston, 536 F.Supp.2d 783, 796 (S.D. Texas 2008). This is so because the mental state element narrows the scope of the statute's prohibition, limits prosecutorial discretion, and mitigates a law's vagueness especially with respect to the adequacy of notice. McFadden, 576 U.S. at 197; Gonzales, 550 U.S. at 150; Posters 'N' Things, Ltd. v. United States, 511 U.S. 513, 526 (1994), citing Hoffman Estates, 455 U.S. at 499.

Economic regulations are "afforded considerable deference in the vagueness analysis" as those involved in commerce may have the ability to obtain a statute's meaning by their own inquiry. United States v. Clinical Leasing Service, Inc., 925 F.2d 120, 122 (5th Cir. 1991). The Supreme Court described this more generous review:

> The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment. Thus, economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process.

Hoffman Estates, 455 U.S. at 498 (emphasis added); see also, Cortes, 536 F.Supp.2d at 796 (same). Fair notice of the prohibited conduct is to be determined from the perspective of a reasonable person in the position of the defendant, and when a prohibition involves the conduct of a select group of persons having specialized knowledge, a court may presume that defendants in that group have a more specialized understanding than would an average person. Hoffman Estates, 455 U.S. at 501 (examining vagueness of ordinance from the perspective of a "business person of ordinary intelligence"); Georgia Electric Company v. Marshall, 595 F.2d 309, 321 (5th Cir. 1979) (recognized hazard can be shown by "proving that the condition is generally known to be hazardous in the industry"); United States v. Weitzenhoff, 35 F.3d 1275, 1289 (9th Cir. 1993)

(en banc) (statute may be upheld if its meaning is well enough known to enable those within its reach to correctly apply it); Precious Metals Associates, Inc. v. Commodity Futures Trading Commission, 620 F.2d 900, 907-08 (1st Cir. 1980) (statute prohibiting trading of commodity options was not unconstitutionally vague where members of regulated group were highly specialized and had thorough knowledge of what was prohibited). The test is whether the "language sufficiently conveys a definite warning as to the proscribed conduct, when measured by common understanding and commercial practice." Id. at 907; United States ex rel. Shott v. Tehan, 365 F.2d 191, 198 (6th Cir. 1966); see also, United States v. Tansley, 986 F.2d 880, 885 (5th Cir. 1993) ("[o]nly a reasonable degree of certainty is required").

"An additional persuasive factor is the degree of notice to the complainant that his conduct is proscribed. The courts are ill disposed to entertain the vagueness challenges of a party who had ample warning that his actions violated statutory requirements." Clinical Leasing Service, 925 F.2d at 122, citing Hoffman Estates, 455 U.S. at 502 (company "had ample warning that its marketing activities required a license"). "The requirement that statutes give fair notice cannot be used as a shield by someone who is already intent on wrongdoing." Tansley, 986 F.2d at 885, citing United States v. Brewer, 835 F.2d 550, 553 (5th Cir. 1987) (defendant "must have known that hacking out long distance access codes to obtain free long distance service was 'wrong'"); United States v. Griffin, 589 F.2d 200, 207 (5th Cir. 1979). In stressing that wrongdoers who knowingly engage in prohibited conduct are precluded from then turning around and complaining about a statute's verbiage, the Supreme Court stated: "[n]or is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." Boyce Motor Lines, 342 U.S. at 340. The Court echoed this theme when it stated "[a] mind intent upon willful evasion is inconsistent with surprised

innocence." United States v. Ragen, 314 U.S. 513, 524 (1942) ("[a] finding of unconstitutional uncertainty in this section of the act as applied here would be a negation of experience and common sense").

Industry standards are a good source of widely accepted and sound methods to operate a safe facility. See generally, Bethlehem Steel Corp. v. Occupational Safety and Health Review Comm'n, 607 F.2d 871, 874 (3rd Cir. 1979) (failure to follow industry standards prohibiting operation of cranes in high winds). For example, in Ensign-Bickford Co. v. Occupational Safety and Health Comm'n, 717 F.2d 1419, 1422 (D.C. Cir. 1983), a vagueness challenge was rejected where the defendant exhibited "plain indifference" to its legal duties, had "actual and constructive notice of the explosive properties of [its] pyrotechnic mix," and disregarded several industry standards.

     B.     Determinations Regarding "As Applied" Challenges Should Occur After Trial, So the Court's Decision Can Be Informed by the Facts

Both the nature of the statutory terms and Indictment language warrant a pre-trial rejection of Defendants' vagueness argument. See generally, United States v. Kaluza, No. 12-265, 2014 WL 295051 at *5 (E.D. La., January 27, 2014) (pre-trial denial of vagueness argument, "assuming that the facts as alleged in the indictment are true, the Court finds that an ordinary person would understand that the defendants' conduct was proscribed in this matter"). An as applied vagueness determination can be conducted only after the evidence has been presented at trial. Only then can a court make the kind of detailed analysis as done, for example, in the Clark case, where the Fifth Circuit extensively relied on trial evidence to reject the vagueness claim:

> Therefore, we move to the vagueness challenge. As a threshold matter, Clark must show that the statute is vague in his case and that he could not have known that transporting a woman from Africa into virtual sex slavery in the United States

10

> was an "immoral purpose." [citation omitted]. That does not strike us as a hard question. There was ample evidence that Clark tricked his victim into coming to the United States for education, then used fear to control her. He paid for her tuition but expected her to be sexually accessible in exchange, and he appeared to be in the process of manipulating her into becoming a plaything—a concubine, one might say—for himself and his friends. His behavior falls squarely within the scope of the statute . . . .

582 F.3d at 614 (emphasis in original).

This is consistent with the approach of other courts. For example, a district judge in Utah denied a facial vagueness argument and deferred ruling "until during or after trial when the facts of the case are more clear," adding that "it is clear that the Court may not rule on an as-applied vagueness challenge until after factual determinations are made at trial if such determinations may be of any use to the Court's decision-making process." See United States v. Moesser, No. 2:09-CR-842, 2010 WL 4811945 at *1, 13 (D.Utah 2010), citing United States v. Reed, 114 F.3d 1067, 1070 (10th Cir. 1997) (reversing pre-trial dismissal on as applied vagueness grounds, as this analysis is "sensitive and fact intensive" and "should be based only on the facts as they emerge at trial").

Similarly in Edwards, the Fifth Circuit stressed that as applied vagueness was examined "only in light of the facts of the case at hand" and found the defendant's "conduct clearly withstands his vagueness challenge," citing Reed in the process:

> The Tenth Circuit reversed and remanded for trial holding that the district court impermissibly determined the constitutionality of the statute on a motion to dismiss before the government had presented any evidence concerning the defendant's conduct. Reed, 114 F.3d at 1070–71.

182 F.3d at 335-36. Another court followed suit and denied a vagueness challenge at the pre-trial stage without prejudice to renew:

> The Court concurs with the Tenth Circuit's reasoning and conclusion in Reed. Heeding the Supreme Court's admonition that a vagueness challenge to a statute

may only be examined in light of the facts of the case at hand, this Court cannot conduct a proper examination of the application of § 922(g)(3) to Bastian's case on the basis of the indictment alone. Accordingly, Bastian's motion is denied without prejudice. Bastian may renew his argument at a later stage of the proceeding, after the Government's evidence pertinent to the issues Bastian raises has been adduced at trial.

United States v. Bastian, 112 F.Supp.2d 378, 380 (S.D.N.Y. 2000); see also United States v. Harris, No. 09-10243, 2012 WL 2402788, at *1 (D.Mass. June 26, 2012) ("the court considered the argument that the wire fraud statute was unconstitutionally vague, but found that this contention would need to be decided in the context of the evidence presented at trial").

C.     This Statute Provides Fair Notice and is Constitutional

The CAA GDC operates "in the same manner and to the same extent" as the GDC in the OSH Act found at 29 U.S.C. § 654. 42 U.S.C. § 7412(r)(1).[2] The OSH Act's formulation "provide[s] a legal standard for applying" its CAA counterpart. United States v. Margiotta, No. CR-143-BLG-SPW-2 (D. Montana) (Margiotta) at September 13, 2019 Order, Doc. 101 at 7, 2019 WL 4394338 at *3. The CAA GDC was expressly modeled after its OSHA parallel,[3] and the courts have consistently rejected claims that the OSHA version is unconstitutionally vague. In Donovan v. Royal Logging, the defendant argued that OSHA's GDC violated due process, but the court found that "a reasonably prudent employer in the industry would have known" of the

---

[2] Cross referencing to other statutes for the purposes of definitions is common. See e.g. 18 U.S.C. § 113(b)(2)("the term 'serious bodily injury' has the meaning given that term in section 1365 of this title"); 18 U.S.C. § 113(b)(3) ("the terms 'dating partner' and 'spouse or intimate partner' have the meanings given those terms in section 2266); 18 U.S.C. § 114 ("…torture (as defined in section 2340)"); 18 U.S.C. § 228(f)(1) ("the term 'Indian Tribe' has the meaning given that term in section 102 of the Federally Recognized Indian Tribe List Act of 1994" (25 U.S.C. § 479a)); 18 U.S.C. § 922(b)(4) ("machinegun (as defined in section 5845 of the Internal Revenue Code of 1986)"); 18 U.S.C. § 922(d)(5)(B) ("nonimmigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(26))"). This is a way of streamlining the United States Code and avoiding repetition.

[3] The legislative history of section 112(r)(1) reinforces that the statutory reference to the OSH Act's General Duty Clause was meant to refer to the interpretation of that clause in OSH Act caselaw as a guide to how the Clean Air Act General Duty Clause should be interpreted. Senate Committee on Environment and Public Works, Clean Air Act Amendments of 1989, S. Rep. No. 228, 101st Congress, 1st Session 209 (1989), reprinted in 1990 U.S.C.C.A.N. 3385, 3594.

hazard. 645 F.2d 822, 831 (9th Cir. 1981). Likewise, in <u>Duriron v. Sec'y of Labor</u>, the defendant argued that OSHA's GDC violated due process because it did not provide notice of the industry standard (in that case, a heat index standard) in a specific OSHA regulation or standard, and the court found this argument to be "without merit" because the industry standard is used as "a benchmark to determine if there was a recognized [] hazard." 750 F.2d 28, 29-30 (6th Cir. 1984). In short, the contention that the OSH Act GDC is unconstitutionally vague "has been rejected by those courts of appeals which have considered it." <u>Ensign-Bickford</u>, 717 F.2d at 1421, citing <u>Bethlehem Steel Corp.</u>, 607 F.2d at 875; and <u>Georgia Electric</u>, 595 F.2d at 322 n 32.

In affirming the finding of a violation of the OSH Act GDC, the Fifth Circuit was decidedly unconfused by the statutory language and instead proceeded methodically through each element and found them all proven. <u>Georgia Electric</u>, 595 F.2d at 320-21 (OSHA enforcement action resulting from electrocution of worker). The court found nothing in the language that was "undefined and fundamentally vague" (Doc. 29 at 3), but instead straightforwardly recounted egregious conduct that killed a worker and violated the GDC:

> The seriousness of the violation of the general duty clause has also been satisfactorily proven. The evidence supporting the finding that the hazard was likely to cause death or serious bodily harm supports the similar requirement of 29 U.S.C.A. § 666(j) that there be a "substantial probability" that death or serious physical harm could result from the questioned condition. Moreover, that the Company "recognized" the hazard of the reversed levers shows in this case that the Company knew, or "with the exercise of reasonable diligence could have known," of the violation of the general duty clause. Thus, all the elements necessary to prove a serious violation of the general duty clause have been satisfactorily established.

<u>Id.</u> at 322. The Fifth Circuit showed the ability to comprehend and apply terms like a "work place free of hazard" while dispensing with a blitz of legalistic company arguments, including describing one contention as "miss[ing] the point" and weekly safety meetings as "the perpetuation of the Company's ignorance-is-bliss policy." <u>Id.</u> at 320. In a footnote, the court also

made quick work of the company's void for vagueness argument, pointing out that obvious dangers provide adequate notice of a GDC violation:

> The Company makes a void-for-vagueness challenge to the application of the general duty clause, arguing that there was nothing in the facts to put a person of reasonable intelligence on notice that the reversed loadline lever was forbidden under the general duty clause. We disagree. In light of the potential danger in operating a crane, known to be defective, within close range of live power lines, the Company was given adequate notice that such might violate the general duty clause.

Georgia Electric, 595 F.2d at 322 n. 32; see also Usery v. Marquette Cement Mfg. Co., 568 F.2d 902, 909-11 (2d Cir. 1977) ("employer's duty" was "clear" and "common sense").

The Fifth Circuit has explained the limits of precision when regulating a broad array of conduct that can cause worker injuries. Ryder Truck Lines, 497 F.2d at 233-34. In upholding a worker safety regulation in the face of a vagueness challenge, the court was unconvinced that the defendant "did not and could not know what was required by the Act," adding:

> The regulation appears to have been drafted with as much exactitude as possible in light of the myriad conceivable situations which could arise and which would be capable of causing injury. Moreover, we think inherent in that standard is an external and objective test, namely, whether or not a reasonable person would recognize a hazard of foot injuries to dockmen, in a somewhat confined space, from falling freight and the rapid movement of heavy mechanical and motorized equipment, which would warrant protective footwear. So long as the mandate affords a reasonable warning of the proscribed conduct in light of common understanding and practices, it will pass constitutional muster.

Id. at 233. In dispensing with the vagueness argument there, the court reflected on the "reasonable man" test, "one of the most nebulously defined concepts in the law," that "has been, and all probability will remain, one of the rudimentary precepts of our law." Id.; see also infra, Clark, 582 F.3d at 614 ("immoral purposes" not unconstitutionally vague).

Industry standards have been relied on to determine whether the CAA GDC has been violated. United States v. Gibson Wine Co., No. 1:15-cv-1900, 2017 WL 1064658 (E.D. Cal.,

March 20, 2017). In <u>Gibson Wine</u>, the defendant released anhydrous ammonia, resulting in a

toxic cloud causing the death of a contract employee. <u>Id.</u> at *1. The defendant contended that the

use of industry standards impermissibly expanded the general duty, but the court disagreed:

> As noted, the general duty created by Section 112(r)(1) of the CAA requires a stationary source owner to identify hazards that may result from a release, maintain a safe facility, and minimize the risk of accidental releases. 42 U.S.C. § 7412(r)(1). Each of those duties requires an understanding of industry standards and each can doubtlessly be violated in a multitude of ways. Each of the violations alleged by the Government is accompanied by specific industry standards. Regardless of the framing of those allegations, each of the Government's allegations that Gibson failed to comply with industry standards weighs on whether the general duty created [by] Section 112(r)(1) was violated.

<u>Id.</u> at *8.[4]

In a detailed and well-reasoned analysis in a recent CAA criminal GDC case, the District

Court for Montana flatly rejected the same vagueness argument made by the Defendants here.

<u>Margiotta</u> Doc 101 at 15-16, 2019 WL 4394338 at *7. There, the court relied on precedent under

the OSH Act GDC, and held that the defendant had "fair notice that his alleged conduct was

forbidden:"

> <u>Just as the OSH Act's general duty clause is not unconstitutionally vague on its face, neither is the CAA's analogous general duty clause.</u> Owners and operators have the general duty "to identify hazards which may result from [accidental] releases using appropriate hazard assessment techniques, to design and maintain a safe facility taking such steps as are necessary to prevent releases, and to minimize the consequences of accidental releases which do occur." § 7412(r)(l). The indictment alleges Margiotta opened an oil processing facility before implementing "appropriate electrical wiring, ventilation, and other safety measures." Margiotta's employees warned him that these hazards were creating a dangerous situation and "[ran] the risk of killing someone." (Doc. l at 5.) The indictment alleges these severe deficiencies allowed an extremely hazardous substance to be released that ultimately caused an explosion and injured three employees. (Doc. 1 at 5-6, 10.) <u>Certainly, the CAA's general duty clause provided</u>

---

[4] This interpretation of the CAA GDC in the civil context is highly relevant and applicable since it is the same statute charged in this case. The Defendants in criminal cases have the added benefit of the "knowingly" mental state requirement. 42 U.S.C. § 7413(c)(l) ("[a]ny person who knowingly violates . . . section 7412 of this title"); (Indictment, Doc. 1 at 8-9). As discussed above, this scienter requirement alleviates vagueness concerns. <u>McFadden</u>, 576 U.S. at 197; <u>Gonzalez</u>, 550 U.S. at 149. Also, unlike civil cases, the United States has a much higher evidentiary burden as Justice Scalia highlighted in <u>Williams</u>, and any "close cases" are addressed not by the doctrine of vagueness, but by the requirement of proof beyond a reasonable doubt." 553 U.S. at 305-06.

> Margiotta with fair notice that his alleged conduct was forbidden. The statute is neither unconstitutionally vague on its face nor as applied.

Id. (emphasis added). For good measure, after describing the CAA GDC as a "distinct, independent, enforceable general duty," the court reiterated that the statute was not vague:

> the CAA's general duty clause is neither vague on its face nor as applied to Margiotta. The statute gave him fair notice that it proscribed the conduct he allegedly engaged in.

Id.

The Permian Basin[5] has high levels of hydrogen sulfide (H2S),[6] which is heavily regulated in Texas, and the Defendants were very familiar with both the dangers of this gas as well as the requirements designed to protect people from it. The Indictment alleged this with specificity:

> Aghorn was aware that its produced water contained high amounts of H2S as well as the deadly nature of the gas. In 2003, the company prepared a contingency plan "to alert and protect the public" in the event of an H2S leak, and described approximately 1200 wells "with various concentrations of hydrogen sulfide" located in residential and publicly accessible areas such as public roadways. The company attached a Data Sheet to the plan describing H2S as "[e]xtremely hazardous" and capable of causing "immediate death" at very high concentrations. On January 10, 2012, Aghorn wrote to the RRC that the hydrogen sulfide concentration of its produced water was 96,000 ppm.

(Indictment, Doc. 1 at 6).

The extensive state regulatory framework regarding H2S is overseen by the Railroad Commission of Texas (RRC) and detailed in what is known as "Statewide Rule 36," codified at 16 Tex. Admin. Code § 3.36. In a manual describing these regulations, the RRC stated:

---

[5] The Permian Basin is an oil-and-gas-producing area located in West Texas and southeastern New Mexico, approximately 250 miles wide and 300 miles long, with more than 7,000 fields in West Texas. Railroad Commission of Texas website at https://www.rrc.texas.gov/oil-and-gas/major-oil-and-gas-formations/permian-basin/.

[6] Over 85% of natural gas streams produced in the Permian Basin are "H2S rich," meaning they contain greater than 100 ppm of H2S. D. Xia and Z. He, Hydrogen Sulfide (H2S) in the Permian Basin, from AAPG 2017 Annual Convention and Exhibition (Posted June 12, 2017), at https://www.searchanddiscovery.com/documents/2017/10950xia/ndx_xia.pdf.; W.A. Cunningham, Hydrogen Sulfide in West Texas, Vol. 42 No. 11 Industrial and Engineering Chemistry 2238, 2241 (November 1950) ("[h]ydrogen sulfide is now available in sizable quantities in the Permian Basin in West Texas and New Mexico").

Hydrogen sulfide is a very deadly gas that can kill within minutes. Hydrogen sulfide gas is encountered in many oil and gas producing formations in the state of Texas and, therefore, can be present at drilling locations, producing wells, tank batteries, production facilities, gas plants, sweetening plants, pipelines, etc.

The purpose of this manual is to acquaint you with the hazards of hydrogen sulfide, the characteristics of hydrogen sulfide, the safety precautions necessary, and the requirements of statewide rule 36 relative to drilling, production, and transportation of hydrogen sulfide gas.

Rule 36 is designed for the protection of the general public from the hazards of hydrogen sulfide gas in oil and gas operations and does not pertain to industrial safety as such. The commission, however, believes that education and safety training are the best defense against the hazards of hydrogen sulfide, and that industry workers must be able to protect themselves if they are to help protect the general public.

RRC, Statewide Rule 36, Hydrogen Sulfide at ii, at https://www.rrc.texas.gov/oil-and-gas/publications-and-notices/publications/swr36-index/. These regulations broadly cover H2S exposure and testing procedures, contingency plans, and control and safety provisions. Id.

For example, under Texas law, Aghorn was required to "install safety devices and maintain them in an operable condition" or "establish safety procedures designed to prevent the undetected continuing escape of hydrogen sulfide" (16 TAC § 3.36(c)(8)). Evidence in this case is expected to show that stationary H2S monitors were inoperable the night Jacob and Natalee Dean died. The failure of these potentially life-saving warning devices was alleged in the Indictment:

The Station had eight stationary H2S monitors that were designed, in the event of an H2S release, to display on a control panel and activate a light at the top of the pump house. On the night of October 26, 2019, none of the monitors were operable and readable at the control panel, and thus they did not trigger the light on top of the pump house to warn Jacob or Natalee Dean of the toxic level of H2S in the pump house.

(Indictment, Doc. 1 at 7).

In addition to this pervasive regulation, the RRC directly warned Aghorn about the dangers of H2S and that it had violated laws related to the hazardous substance. As set forth in a separate filing, the United States expects the evidence to show repeated H2S violations and inspections at Aghorn facilities. (Notice of Intent, Doc. 33 at 18-31).[7] For example, a RRC inspection on September 18, 2013, documented the venting of H2S gas out of the "west fiberglass tank thief hatch" as well as the danger that illegal conduct posed:

> The H2S gas being produced at these batteries is being vented. The facilities are in a sensitive area and the operator does not have authority to vent H2S gas. All gas produced must be used for legal means or flared.

Id. at 22, quoting October 17, 2013, RRC Notice.

Less than two months before the Dean fatalities, on August 30, 2019, at Aghorn's J.E. Bagley lease, the RRC found noncompliance after a FLIR camera detected H2S vapors escaping from a battery, as well as an "[o]dor on site." Id. at 25. The inspection report noted that the facility was in "a designated H2S field" and "in close proximity to public roads and housing," which was described as a "sensitive area." Id. This was a repeat offense, as the RRC cited Aghorn for a similar violation the previous year after a July 16, 2018, inspection, revealed vapors from a non-working flare stack, and warned that flaring was required for "safety reasons," and noting that the facility was in a sensitive area near a street and residences. Id.

In its February 11, 2003, contingency plan,[8] Aghorn memorialized its knowledge of H2S

---

[7] This thumbnail summary of some key facts consists primarily of allegations in the Indictment and other readily verifiable information (e.g., cited industry standards), but is also supplemented with a limited preview and proffer of some expected evidence sufficient to respond to this motion. This, of course is a mere fraction of the evidence and, as discussed below, an as applied vagueness challenge necessarily relies upon facts presented at trial, and thus is not appropriate for pretrial resolution.

[8] The purpose of the contingency plan requirement is to alert and protect the public "following the accidental release of a potentially hazardous volume of hydrogen sulfide." 16 TAC § 3.36(c)(9)(B). "The contingency plan shall be activated . . . immediately upon the detection of an accidental release of a potentially hazardous volume of hydrogen sulfide." 16 TAC § 3.36(c)(9)(C). Following a contingency plan is an industry standard. The plan must conform to applicable legal requirements and outline immediate measures to control the H2S. RP 55 at 7.1; 7.6.b.; and 7.6.c.

hazards and that measures were required to ensure the safety of workers and the community. (Indictment, Doc. 1 at 6). In that plan, Aghorn stated that personnel must be properly trained on "[o]perations of safety equipment and life-support system," (Contingency Plan, II.C.4.d.3. at p. 3), though evidence will show that did not happen, respirators were not possessed by all employees, and required fit-testing for those devices was not done.

The purpose of the contingency plan was to establish safety procedures, provide a coordinated response, and alert and protect the public. (Id. II.A. at p. 1). The plan recognized that residents lived nearby and that many operations "are located in areas of medium to dense (or unpredictable) populations and/or are affected by public streets, roads, or highways." (Id. II.B.1. at p. 1).

In the event of an accidental discharge, the contingency plan called for Aghorn to take immediate action to secure the discharge and continuously monitor H2S concentrations. (Id. III.A.1. and 2. at p. 3; III.A.3.b. at p. 4-5). However, on the night of the fatalities, the evidence will show that Aghorn officials had no monitors and that Odessa Fire Department personnel had to assist Aghorn employees using the fire department's gas monitors.

Aghorn did not successfully secure the release on the night of the fatalities. (Indictment, Doc. 1 at 7). Upon returning to the site the next day, the Fire Department and Sheriff's Office found that there was still a significant amount of H2S being emitted from the pump house. Id. Notwithstanding these high H2S levels, the nearby residences, and the fact that it took two days to stop the leak, there is no evidence that any residents living near the facility were notified of the release. A neighbor who lived nearby recalled seeing the Sheriff's deputies on the road the night of the fatalities and is expected to testify that he was "shocked" and "not told what was going on or not evacuated."

The EPA's website provided detailed and readily available information about the CAA GDC, and thus the Defendants had the ability to obtain its meaning by their own inquiry. See infra, Clinical Leasing Service, 925 F.2d at 122. The EPA issued guidance for implementation of the GDC, which included the fact that criminal enforcement actions could be initiated for violating the statute. See, Guidance for Implementation of the General Duty Clause Clean Air Act Section 112(r)(1), (EPA 550-B00-002, May 2000), available at https://www.epa.gov/sites/default/files/documents/gendutyclause-rpt.pdf (last visited January 3, 2022) and General Duty Clause Fact Sheet, U.S. EPA (EPA 550-F-20-002, April 2020), available at https://www.epa.gov/sites/default/files/2013-10/documents/gdc-fact.pdf (last visited January 3, 2023). The May 2000 guidance document specifically notes that EPA may pursue civil and criminal enforcement actions for Clean Air Act General Duty Clause violations:

> EPA may also bring a civil judicial action pursuant to Section 113(b) of the Act for violations of the general duty clause or request that the Attorney General commence a criminal action in accordance with Section 113(c) of the Clean Air Act against owners/operators for knowing violations of the general duty clause.

Guidance at 6 (emphasis added).

The CAA GDC has a long history of enforcement, which is publicly available. See, e.g., United States v. ExxonMobil Oil Corp., No. 1:19-cv-121, Complaint at 2019 WL 1088041 (March 6, 2019), Consent Decree at Doc. 5 (May 3, 2019) (E.D. Texas, 2019); In the Matter of Chevron Appalachia LLC, (EPA Docket No. CAA-03-2014-0215), 2014 WL 12911438 (Consent Agreement, August 25, 2014); In re Chesapeake Energy Corp., (EPA-5-14-OH-03) 2016 WL 1426724 (Finding of Violation, December 27, 2013); In the Matter of: Samson Lone Star, LLC, (EPA Docket No. CAA-06- 2013-3343), 2013 WL 3379686 (Consent Agreement and Final Order, July 1, 2013). The only difference between these civil and criminal enforcement GDC actions is the requirement that the government prove that the defendant acted "knowingly"

when enforcing the requirement criminally. As noted above, the addition of this scienter requirement adds strength to the conclusion that the CAA GDC is not vague as applied to the facts of this case. See McFadden v. United States, 576 U.S. 186, 197 (2015); Gonzalez v. Carhart, 550 U.S. at 149.

EPA has specifically enforced the CAA GDC regarding H2S, meaning the Defendants had notice that releases of the specific chemical at issue here violated the statute. For example, defendants entered a Consent Decree after the EPA charged them with violating the CAA GDC relating to releases of H2S. In the Matter of: Big Ox Energy-Siouxland, LLC, (EPA Docket No. CAA-07-2017-0453), 2017 WL 11462101 (Consent Agreement and Final Order December 4, 2017); In the Matter of: International Paper Company, (EPA Docket No. CAA-06-2014-3305), 2014 WL 941947 (Consent Agreement and Final Order March 6, 2014); In the Matter of: The Premcor Refining Group, Inc., (EPA Docket No. CAA-06-2013-3339), 2013 WL 5209160 (Consent Agreement and Final Order August 29, 2013); In the Matter of: Holly Refining & Marketing Tulsa LLC, (EPA Docket No. CAA-06-2013), 2013 WL 796571 (Consent Agreement and Final Order February 26, 2013).

A recent civil case in Texas where an employee "died from exposure to hydrogen sulfide" alleged a violation of the CAA GDC. United States v. WTG Processing, L.P., No. 1:21-cv-00182 at Doc. 1 (Complaint at page 12) and Doc. 6 (Memorandum in Support of Consent Decree at pages 1, 6) (N.D. Texas, September 30, 2021). That case resulted in a Consent Decree and Judgment that included injunctive relief and the payment of a fine exceeding $3M. Id. at Doc. 9 at 9 (February 3, 2022).

The Defendants feign being unable to fathom the meaning of "maintain a safe facility," though this is plainly understandable and far more general terms have satisfied constitutional

standards. In addition, industry standards exist for this conduct which are regularly consulted and applied in the oilfield industry.

The hazards posed by H2S are generally recognized by the industry. The national oil trade organization American Petroleum Institute (API) standards are widely relied upon in the industry and have "been a cornerstone in establishing and maintaining standards for the worldwide oil and natural gas industry." https://www.api.org/Standards/. The EPA described the API as "the leading standardizing organization" in oilfield drilling and production. EPA, Report to Congress on Hydrogen Sulfide Air Emissions Associated with the Extraction of Oil and Natural Gas, at G-1 (EPA-453/R-93-045, October 1993).

The United States expects to present evidence regarding these standards, including expert testimony that API Recommended Practice (RP) "is an industry accepted standard," containing guidelines "for safe operations under conditions involving hydrogen sulfide." API RP 55 (2nd Ed. Feb 1995, reaffirmed Jan 2013). These guidelines include warning signs (6.8), fixed monitoring systems to detect H2S (12.4), training (5.1), personal protective equipment (PPE) (6.1), and safe work practices (9.4). Evidence will show that Aghorn's operation contravened multiple standards to include improper ventilation, inadequate PPE, and having inoperable stationary monitors.

Industry standards are also memorialized by the RRC in the Statewide Rule 36 manual, describing H2S as "a very deadly gas that can kill within minutes" and requiring the installation of safety devices designed to prevent releases. Under Texas law, Aghorn was required to "install safety devices and maintain them in an operable condition" or "establish safety procedures designed to prevent the undetected continuing escape of hydrogen sulfide." 16 TAC § 3.36(c)(8). The RRC also mandates training and PPE requirements.

The language of the GDC is not vague. The use of commonly understood and ordinary terms has repeatedly been found to satisfy constitutional standards. This conclusion is even more compelling when considered "in the light of the facts of the case at hand," which shows that the management of H2S was governed by widely accepted and plainly established requirements which were well-understood by the Defendants.

D.      The Defendants' Arguments are Unconvincing

In their Motion, the Defendants cite differences between the GDC clauses in the CAA and OSH Act, though none of them have legal significance nor do they render the CAA GDC "vague." Surely, the court in Margiotta was of this view in its sweeping rejection of claimed vagueness, and explicitly relied on the decisions interpreting the OSH Act GDC. The CAA GDC more than satisfies constitutional requirements.

The Defendants claim not to understand the term "identify hazards" and that the OSH Act GDC formulation of "recognized hazards" provides potential defendants with "better notice," which, according to them, somehow requires this court to render the CAA GDC "a nullity." (Doc. 29 at 10-11). But the phrase "identify hazards" is of course easy to grasp, sufficiently concrete to enforce, and grounded in common sense. This is exactly the kind of "ordinary term" used "to express ideas which find adequate interpretation in common usage and understanding" that the courts have repeatedly approved. See infra; Sproles, 286 U.S. at 393. As discussed, far more general terms have been found constitutional. See infra; Clark, 582 F.3d at 614-15 n.11. This court should reject the Defendants' encouragement to render a statute a "nullity" simply because they prefer a "better" formulation, as this is precisely the kind of unauthorized judicial activism and legislating that the Supreme Court prohibits. See infra; DeBartolo, 485 U.S. at 575 (every reasonable construction must be resorted to in order to save a statute from

unconstitutionality); <u>Sproles</u>, 286 U.S. at 388-89 (legislature is entitled to form its own judgment within its range of discretion). It is not the role of the courts to fashion "better" formulations for statutes meeting constitutional standards. Finally, as discussed above, "identify hazards" is not vague as applied to the Defendants, who were aware that Aghorn's wells had high levels of H2S, and that this gas was hazardous and capable of causing "immediate death" (Indictment, Doc. 1 at 6). The State of Texas also warned Aghorn about venting H2S gas. Therefore, they had "ample warning" and cannot employ "vagueness" as a shield. See <u>infra</u>; <u>Clinical Leasing Service</u>, 925 F.2d at 122; <u>Tansley</u>, 986 F.2d at 885.

The Defendants also erroneously contend that the GDC charge in Count One is "a strict liability felony" (Doc. 29 at 9), though "knowingly" is charged in the Indictment, and is an element of the crime. 42 U.S.C. § 7413(c)(l) ("[a]ny person who knowingly violates . . . section 7412 of this title"); (Indictment, Doc. 1 at 8-9). Not only does Count One not charge "a strict liability felony," but the inclusion of this scienter requirement alleviates any vagueness concerns.

IV.      <u>**CONCLUSION**</u>

For all the foregoing reasons, this court should deny Defendants Aghorn and Trent Day's Motion to Dismiss Count One of the Indictment for Vagueness.

Respectfully submitted,

TODD KIM
ASSISTANT ATTORNEY GENERAL
ENVIRONMENT and NATURAL
RESOURCES DIVISION

By: /s/ Christopher J. Costantini
CHRISTOPHER J. COSTANTINI
Senior Trial Attorney
Pennsylvania Bar No. 64146
Environmental Crimes Section
Environment & Natural Resources Division
4 Constitution Square
150 M Street, NE, Suite 4.212
Washington, DC 20044

By: /s/ Mark T. Romley
MARK T. ROMLEY
Trial Attorney
California Bar No. 240655
Environmental Crimes Section
Environment & Natural Resources Division
999 18th Street, Suite 370, South Terrace
Denver, CO 80202

## Certificate of Service

I certify that on January 3, 2023, I filed this document with the Clerk using the CM/ECF

filing system, which will cause a copy of the document to be delivered to counsel of record.