IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION

UNITED STATES OF AMERICA

v.                                                            NO. 7:22-CR-00049-DC

(1)  AGHORN OPERATING, INC., et al.

**UNITED STATES' OPPOSITION TO DEFENDANTS AGHORN
OPERATING, INC. AND TRENT DAY'S MOTION TO DISMISS COUNT
TWO OF THE INDICTMENT FOR FAILURE TO STATE AN OFFENSE**

I.      **INTRODUCTION**

This ploy to avoid trial on Count Two and instead litigate it under the guise of a motion to dismiss is procedurally flawed and should be denied on that basis alone. The Indictment properly alleges the elements of the offenses and pretrial evidentiary claims masquerading as a "failure to state a claim" cannot provide grounds for dismissal.

The Motion is not only premature, but also misstates the facts. The United States expects the evidence to show that the poisonous gas released in this case was not confined to the inside of a building but was instead regularly spewed out of the building and beyond the facility's fence line into the community, including on the night of October 26, 2019, when Jacob and Natalee Dean were killed by the Defendants' willful and knowing violations of law. The Defendants' underlying legal argument contravenes the statutory terms and would absurdly result in corporations being allowed to knowingly expose their own workers to hazardous air pollutants with impunity.  The meaning of "ambient air" in Count 2 of the Indictment comports with the statutory text and its common, ordinary meaning.  The Defendants' Motion is based on a distinct and separate provision of the Clean Air Act that does not apply to this case. This erroneous

"fence line" ambient air interpretation, lifted from a regulatory definition in a different part of the statute, has recently been rejected by District Courts in Texas, Montana, and Wyoming. This court should do the same.

## II.   <u>BACKGROUND</u>

The Indictment charges crimes related to emissions of hydrogen sulfide (H2S), an extremely hazardous substance that is the leading cause of sudden death in the workplace. (Indictment, Doc. 1 at 8-9). Jacob Dean and his wife Natalee were killed by this poisonous gas on October 26, 2019. (<u>Id.</u> at 6-7).

Count Two of the Indictment alleges Knowing Endangerment under the Clean Air Act (CAA), specifically that between in or about April of 2017 to on or about October 26, 2019, Defendants Aghorn Operating, Inc. and Trent Day "knowingly released into the ambient air an extremely hazardous substance, to wit: hydrogen sulfide, and knew at the time that they thereby placed another person in imminent danger of death or serious bodily injury." (<u>Id.</u> at 9, citing a violation of 42 U.S.C. § 7413(c)(5)).

On November 21, 2022, these Defendants filed a "Motion to Dismiss Count Two of the Indictment for Failure to State an Offense," contending that "ambient air" "does not include the air inside a pump house building." (Motion, Doc. 28 at 1). This motion lacks merit.

## III.   <u>ARGUMENT</u>

### A.   <u>Count Two is Properly Alleged and States an Offense</u>

Count Two of the Indictment is properly charged. The Defendants misstate the nature of the charge and the applicable law and make unsupported assumptions regarding the anticipated

evidence at trial. These issues have no place in a pre-trial Motion to Dismiss but instead are justiciable issues to be litigated at trial.

Defendants claim the United States was required to "allege imminent danger outside a building" (Doc. 28 at 9). This contention suffers from multiple flaws.  First, it is not required by the CAA, nor is such specificity otherwise mandated, given that the Indictment need not contain "evidentiary details."  United States v. Lavergne, 805 F.2d 517, 521 (5th Cir. 1986).  Second, the Indictment does in fact allege the knowing release of H2S, in amounts deemed immediately dangerous to life or health, outside the pump house. (Indictment, Doc. 1 at 6-7). Since there is no dispute that Count Two alleges that H2S was "released into the ambient air" and that the language otherwise tracks the elements in the statute, it "states an offense," necessitating the denial of Defendants' Motion.

> 1.   Count Two Sufficiently Informs the Defendants of the Alleged Offense

A motion to dismiss "for failure to state an offense is a challenge to the sufficiency of the indictment." United States v. Masha, 990 F.3d 436, 443 (5th Cir. 2021). "An indictment is sufficient if it contains the elements of the offense charged, fairly informs the defendant what charge he must be prepared to meet, and enables the accused to plead acquittal or conviction in bar of future prosecutions for the same offense." United States v. Gordon, 780 F.2d 1165, 1169 (5th Cir. 1986). "The test for validity is not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards." Id., citing United States v. Webb, 747 F.2d 278, 284 (5th Cir. 1984). It is "generally sufficient that an indictment set forth the offense in the words of the statute itself as long as the statutory language unambiguously sets out all the elements necessary to constitute the offense." Gordon, 780 F.2d at 1169.

"Although the defendant is entitled to a plain concise statement of the essential facts constituting the offenses charged, the indictment need not provide him with the evidentiary details by which the government plans to establish his guilt." Id. at 1172, citing United States v. Cauble, 706 F.2d 1322, 1334 (5th Cir. 1983). In stressing that an indictment does not have to supply such details, the Fifth Circuit stated:

> Cauble nevertheless contends that the indictment did not put him on notice of the "source, amount, and nature of the 'income' ... and the destination, amount and nature of the 'investment' ...." But the substantive offense charged is the "investment" of "income" in an enterprise and the indictment's wording makes clear that this is the charge against which Cauble must defend. The defendant is entitled to a "plain, concise statement of the essential facts constituting the offenses charged," but the indictment need not set forth every evidentiary detail necessary to establish the elements of the offense.

Cauble, 706 F.2d at 1334; see also Brown v. United States, 228 F.2d 286, 287 (5th Cir. 1955) (indictment that "follows substantially the language of the statute" was sufficient and it was not necessary to charge the specific property alleged to have been stolen); United States v. Smith, 228 F.Supp. 345, 350 (E.D. La. 1964) (where "an indictment sufficiently apprises the defendant of the charges made against him, the absence of some further allegation does not render the indictment fatally defective"). It is not necessary for an indictment to allege in detail the factual proof that will be relied upon to support the charges. United States v. Williams, 679 F.2d 504, 509 (5th Cir. 1982) (element of crime may be alleged "in conclusory terms"); United States v. Crippen, 579 F.2d 340, 342 (5th Cir. 1978); United States v. USPlabs, LLC, 338 F.Supp. 3d 547, 557 (N.D. Texas 2018).

Evidentiary questions should not be determined by pretrial motions. United States v. Miller, 491 F.2d 638, 647-48 (5th Cir. 1974). "A court must deny a motion to dismiss if the motion relies on disputed facts." USPlabs, 338 F.Supp. 3d at 557; United States v. Cespedes, --- F.Supp.3d --- 2022 WL 2905179 at *2 (E.D. La., July 22, 2022). Stated another way, a court can

only rule on a motion to dismiss for failure to state an offense "when the alleged infirmity is a legal question requiring no determinations of fact." United States v. Braun, 453 F.Supp. 3d 883, 886 (M.D. La. 2020), citing United States v. Fontenot, 665 F.3d 640, 644 (5th Cir. 2011). The Rules of Criminal Procedure do not allow for summary judgment, nor do they "provide for a pretrial determination of sufficiency of the evidence;" rather an indictment "is determined from its face" and "sufficient if it charges in the language of the statute."  United States v. Critzer, 951 F.2d 306, 307 (11th Cir. 1992), citing Brown, 228 F.2d at 286.

An indictment "is not defective merely because it fails to anticipate and negative a possible defense." Webb, 747 F.2d at 284. The "law does not compel a ritual of words" in an indictment, and its validity "is to be governed by practical and not technical considerations." Id., citing United States v. Varkonyi, 645 F.2d 453, 456 (5th Cir. 1981). The "practice of fine combing indictments for verbal and technical omissions is no longer countenanced in the courts." Hartwell v. United States, 107 F.2d 359, 362 (5th Cir. 1939).

Just over four months ago, a District Judge in a case very similar to this one, rejected an attempt to raise a "factual dispute" under the guise of a motion to dismiss, finding that an endangerment count can proceed to trial notwithstanding the defendants claim that the release was not in the "ambient air." United States v. E.I. Du Pont De Nemours and Co., No. H-21-16 at Doc. 65 at 24-27, -- F.Supp.3d --, 2022 WL 3566843 at *13-14 (S.D. Texas, August 18, 2022) (Du Pont). The court determined that factual issues were to be resolved at trial, not by a pre-trial ruling. Id. at 27. In thwarting the unauthorized attempt to abort the endangerment charge, the court in Du Pont put the culpability of the four fatalities squarely before the jury, where it belongs.

      2.   Count Two States a Knowing Endangerment Offense under the CAA

Count Two of the Indictment in this case tracks the elements of the statute, unambiguously sets out all the elements necessary to constitute the offense, and fairly informs the defendants what charge they must be prepared to meet. As noted previously, it alleges specifically that between in or about April of 2017 to on or about October 26, 2019, the Defendants "knowingly released into the ambient air an extremely hazardous substance, to wit: hydrogen sulfide, and knew at the time that they thereby placed another person in imminent danger of death or serious bodily injury." (Id. at 9, citing a violation of 42 U.S.C. § 7413(c)(5)). The Defendants impermissibly and prematurely seeks to litigate the underlying case. Contesting the extent of air emissions at this stage has no acceptable relationship to a motion seeking dismissal of a charge due to an alleged defect on the face of an indictment. This has nothing to do with "failing to state an offense" but is instead an unauthorized end-run around the criminal adjudication system. The Defendants also fundamentally mischaracterize what happened in this case.

B.        The Defendants' Factual Contentions are Not Only Premature But Wrong

In addition to being procedurally defective, the Defendants mischaracterize the Indictment as well the underlying nature of the criminal conduct. This precludes the granting of a motion to dismiss an indictment for failure to state an offense.

1.        The Indictment's Language

In analyzing Count Two, the Defendants focus exclusively on the death of Jacob and Natalee Dean on October 26, 2019. (Doc. 28 at 4-5, 7 n.2). However, the charged time period is "between in or about April of 2017 to on or about October 26, 2019," which far exceeds that single tragic day and allows evidence of releases into the ambient air during an almost thirty-month period. The narrow focus on one day within this lengthy time renders the argument

flawed.

Also, the factual allegations in the Indictment are broader than those described by the

Defendants. Paragraph 27 states in part:

> The Odessa Fire Department and the Ector County Sheriff's Office responded <u>to the scene</u> on October 26, 2019. <u>Both bay doors of the pump house were open</u> and dangerously elevated levels of H2S were detected.

(Doc. 1 at 6). The fact that both bay doors were open in a cramped pump house obviously

demonstrates that the gas inside had easy egress outdoors. Further, in stating that "dangerously

elevated levels of H2S were detected" at "the scene" (not "in the pump house") the Indictment

does not reflect that the levels were found solely inside the pump house. In fact, consistent with

the allegations in the Indictment, the evidence at trial will show that the Odessa Fire Department

detected potentially lethal levels of H2S both inside and outside the pump house ("the scene") on

the evening of October 26, 2019.[1] The Indictment also expressly describes dangerous levels of

H2S still being released into the ambient air outside the pump house on the day after the Dean

fatalities:

> On the night of October 26, 2019, an Aghorn representative advised the Sheriff's Office that "the field had been shut in and there was no longer any product flowing." However, when Fire Department and law enforcement officials returned to the site the next day on October 27, 2019, they observed produced water leaking from the pump in the pump house and <u>again</u>[2] detected elevated H2S readings <u>outside the pump house bay doors</u>, with a reading outside one of the bay doors of 150 ppm. The Fire Department then shut off the main suction line leading into the building, which succeeded in stopping the leak. When they returned to the site the following day, October 28, 2019, they detected a zero reading for H2S.

(Doc. 1 at 7) (emphasis added).

---

[1] H2S levels exceeding 100 ppm are "immediately dangerous to life and health" (IDLH). <u>See</u> <u>generally</u>, 29 C.F.R. § 1910.134(b); OSHA and National Institute for Occupational Safety and Health (NIOSH) websites at https://www.osha.gov/hydrogen-sulfide/hazards and https://www.cdc.gov/niosh/idlh/7783064.html.
[2] The use of "again" in Paragraph 29 is consistent with the reference in Paragraph 27 to the "scene," which broadly describes the location that the authorities responded to, including areas outside the pump house.

2.   <u>The H2S Releases in this Case</u>

The Defendants erroneously allege that a release to ambient air means a release to an area outside the fence line of a site. There is no such requirement in the statute. This, standing alone, warrants a denial of the Motion.

H2S readings by the Odessa Fire Department will show potentially lethal releases in the air outside pump house on both the night of the fatalities, October 26, 2019, as well as the next day. The evidence will also show that on the night the poisonous gas killed the Deans, the hazardous plume traveled beyond the facility at levels sufficient to adversely impact public health. In addition, H2S releases at this site (and other Aghorn sites) prompted many complaints from neighbors and contractors, including those suffering health effects, as the company has been a longstanding nuisance to the community. "Previewed" trial evidence of this kind was a factor in one court recently denying a nearly identical "fence line" argument:

> The government provided exhibits showing that the toxic gas traveled to parking lots that were accessible to the public. (Docket Entry Nos. 52-1; 52-3). The government previewed that "a [case] agent will testify that although both parking lots are fenced and have gates, they are accessible to the public and the east lot serves as a visitor parking lot." (Docket Entry No. 52 at 28). The indictment alleged that the same gas that killed workers inside the building also injured multiple workers outside the building and traveled beyond the fence line. DuPont is raising a factual dispute as to where the gas went and whether those locations constitute "ambient air."

<u>Du Pont</u> at 26-27, 2022 WL 3566843 at *14.

The Defendants' release of H2S killed two people, placed rescue personnel, firefighters, and law enforcement agents in danger, and exceeded EPA health-based levels[3] for the

---

[3] H2S at .51 ppm concentration is the "EPA 1 hour nondisabling acute exposure guideline level," also known by the acronym "AEGL." (Lowry Final Report attached as Exhibit 1, at Table 3, at 35) (Lowry Final Report). According to Dr. Kristen Keteles at NEIC this level would lead to adverse health impacts. (Keteles Final Report attached as Exhibit 2, at 12) (Keteles Final Report) (redacted version, Defendants have been provided the unredacted version in discovery).

community surrounding the facility. The government expects the evidence to show that, during the charged time period, the Defendants routinely and indiscriminately released poisonous gas both inside and outside the pump house.

An EPA expert report documented elevated H2S readings on October 26, 2019, outside the pump house, including one that exceeded IDLH limits. (Lowry Final Report at 30). In recounting this evidence, Dr. Lowry detailed high readings encountered by Fire Department personnel as they approached the pump house where Jacob and Natalee Dean lie dead:

> On October 26, 2019, while walking up the road on the east side of the interior property fence, members of the Odessa Fire Department measured 26 ppm hydrogen sulfide at 8:56 p.m. (20:56) near the south fence opening and 111 ppm hydrogen sulfide at 8:58 p.m. (20:58) near the north opening in the fence.

Id. (footnotes omitted).

EPA air dispersion modeling concluded that on October 26, 2019, high levels of H2S traveled up to a mile (5,035 feet/.95 miles) (Lowry Final Report at 33-35). The H2S release migrated far beyond the facility's fence line as depicted in the following aerial photographs:



**Figure 8 MARPLOT® of ALOHA® threat zones of 0.12 ppm, 0.51 ppm, and 0.75 ppm for a ground level hydrogen sulfide release of 16.2 pounds per hour from the south bay door of the facility with the wind from the southwest (200 degree) at 6 mile per hour at 10 meters.**



**Figure 9 MARPLOT® of ALOHA® threat zones of 0.12 ppm, 0.51 ppm, and 1 ppm for a ground level hydrogen sulfide release of 46.2 pounds per hour from the south bay door of the facility with the wind from the southwest (200 degree) at 6 mile per hour at 10 meters.**

Id. at Figure 8 (using the low end of modeling range of 16.2 pounds per hour) and Figure 9

(using high end of modeling range of 46.2 pounds per hour). The United States expects the

evidence to show that an investigator responding to the incident on October 26, 2019, noticed the

H2S odor approximately a mile from the facility, indicating emissions were traveling far off site.

(Keteles Final Report at 12).

An EPA Toxicologist stressed that low-levels of H2S pose risks to public health:

> Repeated or prolonged exposure to H2S has been associated with low blood
> pressure, headache, nausea, loss of appetite, weight loss, eye-membrane
> inflammation, and chronic cough. Chronic exposure to H2S can result in
> persistent and permanent neurological symptoms, including psychological
> disturbances. Reported effects from low levels of exposure include
> incoordination, poor memory, hallucinations, personality changes, and loss of
> sense of smell. Increases in the occurrence of neurological symptoms such as
> headaches, loss of balance, memory loss, and fatigue have been reported in
> studies of communities living near industrial sources of hydrogen sulfide. For
> example, neurological effects were found in a 20-month-old child who was
> exposed to low levels of H2S for a year from H2S emitted from a coal mine.
> Chronic, low-level exposure to H2Scan also result in respiratory effects. Studies
> of communities near sources of elevated hydrogen sulfide have found increases in
> respiratory symptoms such as nasal irritation, shortness of breath, cough,
> exacerbation of asthma, and increases in visits to the emergency room.

(Keteles Final Report at 13-14). That Toxicologist also documented instances where H2S

emissions were "noticeable off-site" and "[i]ndividuals who reside or work adjacent to the site

described being able to smell H2S routinely," citing one neighbor who "would get migraine

headaches from the odor." Id. at 12. The owner of a feed store near another Aghorn facility

"called on a regular basis to complain about strong H2S odors" while the Texas Railroad

Commission detected the venting of H2S gas from still another Aghorn site "in close proximity

to the public." Id. at 13. The Toxicologist described these and other H2S releases from Aghorn

as "a chronic issue." Id.

C.    Defendants' Motion Disregards the Plain Meaning of Ambient Air

The Defendants' argument that ambient air consists solely of air outside the fence line

effectively places workers outside the protections of the CAA's endangerment provisions. It also

11

runs counter to the language in the statute. The knowing endangerment offense simply requires a "release[]" of a hazardous substance "into the ambient air." 42 U.S.C. § 7413(c)(5). "If the statutory text is unambiguous, our inquiry begins and ends with the text." Asadi v. G.E. Energy (USA), L.L.C., 720 F.3d 620, 622 (5th Cir. 2013), citing BedRoc Ltd., LLC v. United States, 541 U.S. 176, 183 (2004).

Where the language is clear, "the court's sole function is to enforce it according to its terms." United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 241 (1989); see also Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 570 (1982) (where the will of Congress "has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive"). Undefined words in a statute must be given their ordinary or natural meaning. Bailey v. United States, 516 U.S. 137, 145 (1995) (applying Webster's and Black's Law Dictionary definitions to determine meaning of "use" in firearms statute); Smith v. United States, 508 U.S. 223, 228-29 (1993); United States v. Lowe, 118 F.3d 399, 403 (5th Cir. 1997) (applying dictionary and legal thesaurus meaning to "monitor" in CERCLA).

The common, ordinary meaning of ambient is "[t]hat surrounds or encircles; that lies on all sides of something; encompassing." Oxford English Dictionary, 3d ed. In the context of "a fluid such as air or water: that creates a surrounding medium; enveloping." Id. The applicable common, ordinary meaning of release is "[t]o make or set free; to free from restraint, confinement, or captivity…." Id.

Had Congress intended this easy-to-understand term to mean outside a facility's fence line, it would have been a simple matter to so provide a definition of that sort in Section 113(c)(5) of the Act, where it defined other terms relevant to the knowing endangerment offense, such as "serious bodily injury." See 42 U.S.C. § 7413(c)(5)(F). It is impermissible for the

Defendants to resort to an inapplicable EPA regulatory definition to limit an undefined statutory term. Therefore, the plain meaning of the statutory language precludes interpretation that "ambient air" is defined as outside a facility's fence line.[4]

The Defendants, grasping for means to exclude its facility workers from the ambit of the knowing endangerment provision, go far beyond the plain meaning of the statute to argue that "ambient air" means only air outside the facility's fence line. They circumvent the plain meaning of that term by pointing to the regulatory definition of "ambient air" that EPA promulgated for a distinct and separate provision of the Clean Air Act: the National Ambient Air Quality Standards (NAAQS). EPA promulgated definitions to implement that program, including a definition for ambient air: "that portion of the atmosphere, external to buildings, to which the general public has access." 40 C.F.R. § 50.1(e).

That regulatory definition applies only to the NAAQS standards and is explicitly restricted by its terms to "this part," referring to "Part 50-National Primary and Secondary Ambient Air Quality Standards." 40 C.F.R. § 50.1. The authority to issue the regulation was specifically tied back to the NAAQS standards. See Part 410—National Primary and Secondary Ambient Air Quality Standards. 36 Fed. Reg. 8186, 8187 (Apr. 30, 1971) (exclusively citing Sec. 4, Public Law 91-604, Stat. 1679 as the authority for the issuance of the regulations, including the definitions codified at 40 C.F.R. § 50.1.)[5] There is no textual support for the notion that this

---

[4] Defendants argue that Congress chose to adopt and apply the NAAQs regulatory definition of "ambient air" when it chose the term "ambient air" over the word "air" during enactment of the endangerment provisions.  Doc. 28 at 12-13.  But there is nothing in the legislative history of the CAA amendments of 1990 that indicates Congress made this choice so that the regulatory definition of "ambient air" for purposes of the NAAQs provision would be applied to the endangerment provisions. Indeed, there is nothing in the legislative history that explains this choice at all, so any attempt discern the reason for it is completely speculative.

[5] This regulatory definition was finalized in April 1971 pursuant to legislative authority to implement the NAAQs program; the Federal Register notice setting forth the regulatory definition of "ambient air," together with all subsequent Federal Register notices expanding or interpreting 40 C.F.R. § 50.1, refer exclusively to the NAAQS legislation as the authorizing statute. See 36 Fed. Reg. 8186 (Apr. 30, 1971); 41 Fed. Reg. 11252 (Mar. 17, 1976); and 48 Fed. Reg. 2528 (Jan. 20, 1983).

narrowly tailored regulatory definition for a discrete part of the CAA should be inserted into separate statutory endangerment provisions enacted years later. Not only is there an absence of omnibus language extending this provision to other parts of the CAA, the text of the regulation expressly limits it exclusively to the part it defines.

The CAA's NAAQS and criminal endangerment provisions also have wholly different objectives and implementation strategies. Recognizing that air pollution "is the result of pollution from numerous highly diversified sources," H.R. Rep. No. 91-1146, at 15 (1970), Congress promulgated the Clean Air Act of 1970, including the NAAQS, which require EPA to set national standards for six criteria pollutants. 42 U.S.C. § 7408. To ensure those standards are met, or "attained," States must adopt plans to implement, maintain, and enforce the NAAQS in each air quality control region within the state. 42 U.S.C. §§ 7404, 7410(a). If an area is determined to be in nonattainment for any criteria pollutant, additional requirements apply to sources of pollution within the area, in order to bring it into attainment. 42 U.S.C. §§ 7501-7509a.

In contrast, the criminal endangerment provisions, enacted twenty years later, were designed to prevent and mitigate catastrophic chemical accidents. They were intended to protect human health and the environment from serious harm and deter conduct that might create dangerous conditions.

When one court was asked to apply the NAAQS definition of "ambient air" to a CAA endangerment offense,[6] it resoundingly declined to do so. In United States v. O'Connell, the court denied the defendants' motion to dismiss, concluding that the NAAQS definition "was written for the section of the Clean Air Act that governs NAAQS and was not intended to apply

---

[6] The negligent counterpart to the knowing endangerment provision found at 42 U.S.C. § 7413(c)(4).

to the endangerment provisions of the Act." No. 17-CR-50, 2017 WL 4675775, at *2 (E.D. Wis.

Oct. 17, 2017). Instead, because "the plain meaning of the term and the context control[,]" the

court explained:

> The word "ambient" does not mean "outdoors"; it means "existing or present on all sides; encompassing." MERRIAM–WEBSTER'S COLLEGIATE DICTIONARY 36 (10th ed. 1999). Construing the term "ambient air" to include air inside the building does not make the word "ambient" superfluous. It means that it is not enough for the asbestos simply to be present in an isolated portion of the air; it must be diffused into the surrounding air, whether that air is inside or outside of the building.

Id. at *3.

The District Court in O'Connell had little trouble distinguishing the NAAQS and

endangerment provisions, and squarely determined that use of the fence line definition there "does

not mean that the same definition applies in all other provisions of the Clean Air Act." Id. The

court pointed out the unique nature of the NAAQS provision and its inapplicability to other parts

of the CAA:

> The Ambient Air Quality Standards, after all, are intended to apply only to the air on the outside of buildings that all of us breathe. No such definition appears in the regulations governing asbestos removal, which generally takes place indoors.

Id. Instead, the court chose the common understanding of "ambient air" based on "the plain

meaning of the phrase" "especially in light of the use of the context in which it appears in the

criminal endangerment provisions of the Act." Id. at *2.

In the Du Pont case, the court also rejected an attempt to dismiss an indictment on a "fence

line" interpretation in a pre-trial motion to dismiss. Du Pont, at Doc. 65 at 24-27, 2022 WL

3566843 at *13-14. There, the court declined, for a combination of factual and legal reasons, to

adopt the exact legal argument advanced here: that "ambient air" "is limited to air 'beyond the

fence line'" of the defendant's facility. Id. at 26-27, *14.

Likewise, in a recent significant endangerment case, the court for the District of Wyoming instructed on the plain meaning of ambient air instead of the erroneous "fence line" formulation. See United States v. Rimmasch, No. 21-CR-138 at Doc. 141 at page 39 (D. Wyoming, April 13, 2022). In Rimmasch, the defendants were charged with knowing endangerment regarding releases "into the ambient air," and the court instructed the jury that: "The term 'ambient air' means the air present all around us." Id.; and Id. at Superseding Indictment, Doc. 36 at 6-7.  The court thus straightforwardly and correctly applied the statutory term rather than resorting to an inapplicable definition found in another provision of the CAA.

The Defendants' Motion rests on the faulty premise that "ambient air" must mean the same thing in the CAA's criminal endangerment provisions as EPA says it means in the context of the NAAQS provisions. This ignores the fact that the CAA established multiple distinct regulatory schemes for controlling air quality, which the Supreme Court recognized when it unanimously declined to interpret identically a term ("modification") that appears in two different portions of the CAA, finding that a "given term in the same statute may take on distinct characters from association with distinct statutory objects calling for different implementation strategies," and there is "no 'effectively irrebuttable' presumption that the same defined term in different provisions of the same statute must be interpreted identically . . . [c]ontext counts." Env't Def. v. Duke Energy Corp., 549 U.S. 561, 574-76 (2007).[7]

Finally, by carving out a defense to the endangerment of a specific subset of workers –

---

[7] Congress could have drafted a single definition of "ambient air" had it intended for such a definition to apply across all of the varied parts and programs encompassed in the Act. It took this approach in drafting another prominent environmental statute, the Clean Water Act, which contains a single statutory definition of "navigable waters." 33 U.S.C. § 1362(7). Congress took the same approach when drafting the federal hazardous waste law, the Resource Conservation and Recovery Act (RCRA), which includes a single definition of the term "hazardous waste" to be applied across the full statutory enactment. 42 U.S.C. § 6903(5). The Clean Water Act was enacted in 1972, RCRA in 1980. Despite the demonstrated ability to provide a singular definition of a term for all purposes, Congress chose not to follow the same course in drafting the 1990 amendments to the Clean Air Act. It opted instead to leave the term "ambient air" undefined.

those who can freely give consent to be endangered – Congress showed that it intended other workers – those who have not freely given consent – to be protected by the endangerment provisions. The Clean Air Act's knowing endangerment offense established an affirmative defense if "the conduct charged was freely consented to by the person endangered and that the danger and conduct charged were reasonably foreseeable hazards of … an occupation, a business, or a profession … ." 42 U.S.C. § 7413(c)(5)(C)(i). This defense is clearly premised on the notion that some individuals with an occupational connection to the source of a potential release could be in a position to consent to the endangerment; members of the public outside the fence line, lacking such an occupational connection, would not be in a position to give that consent.

The Defendants' reliance on United States v. Ho is misplaced. No. 4:00-CR-183 at Doc. 94 (S.D. Texas, November 17, 2000) (Exhibit 6-H to Defendants' Motion at Doc. 28-14). There, the court granted a Daubert motion to exclude expert testimony that "addresses the effects of asbestos which affected workers only inside the hospital or inside the abandoned hospital building …" in a knowing endangerment case. Id. at 8. (S.D. Tex. Dec. 1, 2000). The government respectfully suggests that the O'Connell court had the better argument here, namely that the plain meaning of "ambient" should control.

Ho is factually distinguishable in significant ways. That case involved asbestos releases exclusively into indoor air which the court found did not pose a risk to workers of "imminent danger of death or serious bodily injury," since any risk might manifest in an "extended period of two to four decades into the future." Id. at 9.[8] This is a far cry from the immediately lethal effects of high H2S, which, according to NIOSH, is an acute toxic substance that is the leading cause of

---

[8] The court added: "At most it seems to me that [the government's expert witness] has given an opinion that there was only some increased risk or a serious increased risk that the workers may, but not necessarily, develop injuries in some 20 to 40 years from now if they survive all of life's other perils during those intervening decades." Ho, Doc 94 at 10.

sudden death in the workplace and is especially toxic when it occurs in low-lying areas, confined spaces, or in high concentrations under pressure. (Indictment, Doc. 1 at 5). The immediate and fatal impact that snuffed out the life of a husband and wife in the presence of their two young children sharply contrasts with the release in Ho that might have caused a risk decades later.[9]

This case is more like the widespread release in Du Pont – where the court refused to dismiss the endangerment count – than the purely indoor air in Ho. As discussed in more detail above, the release in this case resulting in deadly concentrations outside the pump house and the polluted plume traveled far beyond the facility into the adjoining community.

Finally, the Defendants reliance on Ho is particularly misguided given that court's explicit refusal to invest its oral transcript determination with any precedential impact. When the prosecutor in Ho asked the Judge to issue a published memorandum opinion, he demurred, stating that he was "not eager to take on things simply to elucidate or to add to the body of general law." Ho, Doc 94 at 11. This refusal to memorialize is in sharp contrast to the detailed reasoning in the written opinions by both the Magistrate Judge and District Judge in O'Connell, which squarely addressed the issue and clearly rejected the use of the NAAQS ambient air definition in favor of the dictionary meaning.

The Defendants also rely on United States v. W.R. Grace, in which the court excluded evidence of or derived from indoor releases in another knowing endangerment case. 455 F. Supp. 2d 1172, 1175-77 (D. Mont. 2006).  O'Connell, however, correctly and expressly rejected that decision, deciding instead to apply the "plain meaning" of ambient air, adding that the NAAQS

---

[9] Thus, Ho's reliance on risk occurring much later makes it completely inapplicable on these facts. Nonetheless, it should be noted that asbestos is extremely hazardous and has been the subject of a long history of endangerment convictions. See e.g., Rimmasch, at Docs. 36, 142-43, 186-87; United States v. Robl, No. 3:18-cr-136 at Docs. 5, 23, and 77 (W.D. Wisc. February 3, 2021), aff'd 8 F.4th 515 (7th Cir. 2021); United States v. Farmer, No. 8:13-cr-938 at Docs 2, 32, 36 (D.S.C. August 27, 2014).

definition "does not mean that the same definition applies in all other provisions of the Clean Air Act." 2017 WL 4675775, at *2-3. Significantly, W.R. Grace was decided before the Supreme Court recognized the severability of Clean Air Act provisions "with distinct statutory objects calling for different implementation strategies." Duke Energy Corp., 549 U.S. at 574-76.

With respect to United States v. Margiotta, the Defendants mischaracterize the United States' proposed jury instruction on the meaning of "ambient air" as being "rejected" by the court. (Motion, Doc. 28 at 16). Rather, in a conference discussing the jury instructions, the court in Margiotta observed that under the facts presented at trial, the government could meet its burden of proving a knowing endangerment offense, even if the more restrictive defense-proposed jury instruction was given and that accepting the defense-proposed instruction would eliminate the risk of appeal on that issue. United States v. Margiotta, 1:17-cr-00143, Transcript (Doc. 160) at 864-65. Following this conference, the government withdrew its proposed jury instruction. United States v. Margiotta, 1:17-cr-00143, Dkt. No. 126 at 28. In discussing the government's proposed instruction before it was withdrawn, the court stated: "I don't disagree with [the government]," and going as far as stating that the fence line argument that leaves workers at a facility unprotected "doesn't make sense." Transcript at 864. Margiotta, then, is consistent with the United States' interpretation here.[10]

---

[10] Defendants cite EPA letters, guidance and administrative decisions from 1980, 1986, 1989, and 2019 to argue that EPA has consistently reaffirmed the NAAQs definition of "ambient air" over the decades. Doc. 28 at 10, Exhibits 2-5.  But that consistency only related to the definition of "ambient air" for the NAAQs provisions.  The first three cited documents were authored when the only place "ambient air" appeared in the CAA was the NAAQs provision. The December 2019 memorandum, although authored after the endangerment provisions were enacted in the 1990 CAA amendments, makes clear in the second sentence that it was also addressing only the NAAQs program:  "In the context of developing and implementing national air quality standards under the Clean Air Act, the EPA defines 'ambient air' at 40 CFR 50.1(e) as 'that portion of the atmosphere, external to buildings, to which the general public has access.'" Memorandum from Andrew Wheeler, EPA Administrator, to Regional Administrators, Revised Policy on Exclusions from "Ambient Air" at 1 (Dec. 2, 2019) (available at www.epa.gov/sites/defult/files/2019-12/documents/reivsed_policy_on_exclusions_from_ambient_air.pdf ) (emphasis added).

D.      Defendants Arguments are Contrary to a Long History of Convictions

There is an "extensive body of successful CAA [endangerment] prosecutions involving death or injury to workers on non-publicly accessible property." Michael R. Fisher, When Pollution Threatens the Workplace: Occupational Safety and Environmental Endangerment Crimes, 68 DOJ J. Fed. L. & Prac., 147, 168 (March 2020). The Defendants "fence line" argument runs counter to a large number of convictions arising out of releases inside facility boundaries. Examples include:

- Among the earliest CAA endangerment cases was the 1994 prosecution of two individuals who directed a crew of inmate workers to dispose of drug lab and other unknown chemical wastes into a pit at a Parish Corrections Center, generating a chemical cloud that exposed workers to toxins. United States v. Morgan, No. 2:94-CR-20051-02 (W.D. La. 1994).

- After a 1997 refinery explosion in Minnesota, the Ashland Oil company was prosecuted for negligent CAA endangerment and paid over $9 million in criminal fines, restitution to five injured employees, and community service payments United States v. Ashland Oil Co, Inc., No. CR-02-152 (D. Minn. 2002).

- A 2001 refinery explosion that killed one worker, critically injured another, and endangered others led to the prosecution of Motiva Enterprises, LLC, on negligent endangerment and other charges, resulting in a $10 million fine. United States v. Motiva Ents., LLC, No. 1:05-cr-00221 (D. Del. 2005).

- The fatal release of antimony pentachloride from a mislabeled cylinder that a worker attempted to evacuate for reuse led to a negligent endangerment plea by Honeywell International, Inc., which paid a criminal fine of $8 million, $2 million

in restitution to the victim's estate, and another $2 million in community service. United States v. Honeywell Int'l, Inc., Crim. No. 07-31-RET-SCR (M.D. La. 2007).

- Two executives of a Louisiana refinery received short prison terms after pleading guilty to negligently endangering the company's workers at their facility. United States v. Hamilton, No. 2:11-CR-00130; United States v. LeBleu, No. 2:11-CR-00266 (W.D. La. 2011).

- A knowing endangerment prosecution in South Carolina involved asbestos "rip and strip" crimes during the demolition of an abandoned textile mill and resulted in a 41-month term of incarceration. United States v. Farmer, No. 8:13-CR-938 (D.S.C. 2013).

- And in late 2016, two petro-chemical companies in Texas pleaded guilty to negligent endangerment and paid a multi-million dollar fine after a tank explosion at their Port Arthur processing facility killed one worker at the plant and severely injured two others. United States v. KTX Ltd., No. 1:16-cr-00075-MAC-KFG (E.D. Tex. 2016).

Fisher, Id.[11]

---

[11] This is not an exhaustive listing, and additional relevant cases include: United States v. McCann, 3:06-cr-00097, Plea Agreement, ECF No. 7 at ¶ 10 (M.D. La. July 18, 2006) (pipe production process "released uncontrolled styrene emissions into the ambient air both inside and outside of the facility … pos[ing] an imminent danger of serious bodily injury to the workers at the facility"); United States v. Chemical and Metals Inc., 3:08-cr-00028, Plea Agreement, ECF No. 32 at 3 (M.D. La. Jan. 13, 2010) (release of spent antimony compounds and hydrogen fluoride from a mislabeled tank at chemical factory killed a worker attempting to open a valve on the tank); United States v. Keough, 8:14-cr-000349, Plea Agreement, ECF 44 at 2 (D. Neb. Nov. 21, 2016) (workers endangered by emission of paints and solvents used to manufacture fiberglass); and United States v. Stevens, 8:16-cr-00154, Plea Agreement, ECF No. 8 at 2-3 (D. Neb June 23, 2016) (paints and paint thinners containing hazardous air pollutants endangered employees handling and using the products).

E.      Rule of Lenity and Fair Notice

There is no "grievous ambiguity or uncertainty" in the knowing endangerment provision after review of its text, structure, history, and purpose, and accordingly, the rule of lenity is not applicable. Barber v. Thomas, 560 U.S. 474, 488 (2010) ("[T]he rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a 'grievous ambiguity or uncertainty in the statute' … such that the Court must simply 'guess as to what Congress intended'") (internal citations omitted). Since Congress spoke in "clear and definite" language, the rule of lenity is not implicated. United States v. Bass, 404 U.S. 336, 347 (1971).

The Defendants had ample notice that a knowing release of an extremely hazardous pollutant into the air within its fence line that endangered workers violated the CAA. Over the years and throughout the country, many courts have accepted guilty pleas in endangerment cases where workers were injured or killed inside a facility fence line.  It is beyond belief to suggest that Aghorn operated its facilities under the assumption that provisions of the Clean Air Act designed to protect people who could be exposed to hazardous pollutants did not apply to people working at its facilities.

IV.     **CONCLUSION**

For all the foregoing reasons, this court should deny Defendants Aghorn and Trent Day's Motion to Dismiss Count Two of the Indictment for Failure to State an Offense.

Respectfully submitted,

TODD KIM
ASSISTANT ATTORNEY GENERAL
ENVIRONMENT and NATURAL
RESOURCES DIVISION

By: /s/ Christopher J. Costantini
CHRISTOPHER J. COSTANTINI
Senior Trial Attorney
Pennsylvania Bar No. 64146
Environmental Crimes Section
Environment & Natural Resources Division
4 Constitution Square
150 M Street, NE, Suite 4.212
Washington, DC 20044

By: /s/ Mark T. Romley
MARK T. ROMLEY
Trial Attorney
California Bar No. 240655
Environmental Crimes Section
Environment & Natural Resources Division
999 18th Street, Suite 370, South Terrace
Denver, CO 80202

**Certificate of Service**

I certify that on January 3, 2023, I filed this document with the Clerk using the CM/ECF

filing system, which will cause a copy of the document to be delivered to counsel of record.